# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| REVOLUTION RETAIL SYSTEMS, LLC, a Delaware Limited Liability Company, as successor to New Tidel Revolution, LLC, | ) ) ) ) | |
| Plaintiff/Counterclaim Defendant, | ) ) | C.A. No. 10605-VCP |
| v. | ) ) | |
| SENTINEL TECHNOLOGIES, INC., a Delaware corporation, TIDEL, INC., a Delaware corporation, and TIDEL ENGINEERING, LP, a Texas Limited  Partnership, | ) ) ) ) ) ) | |
| Defendants/Counterclaim Plaintiffs. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: August 20, 2015
Date Decided: October 30, 2015

Michael W. McDermott, Esq., David B. Anthony, Esq., BERGER HARRIS LLP, Wilmington, Delaware; Charles E. Phipps, Esq., LOCKE LORD LLP, Dallas, Texas; *Attorneys for Plaintiff/Counterclaim Defendant*.

C. Malcolm Cochran, Esq., Jeffrey L. Moyer, Esq., Steven J. Fineman, Esq., Christine D. Haynes, Esq., Selena E. Molina, Esq., RICHARDS, LAYTON & FINGER, P.C., Wilmington, Delaware; Mark E. McKane, Esq., Christopher W. Keegan, Esq., Kevin K. Chang, Esq., KIRKLAND & ELLIS LLP, San Francisco, California; *Attorneys for Defendants/Counterclaim Plaintiffs*.

**PARSONS, Vice Chancellor.**

The plaintiff and defendant entities in this breach of contract action are in the business of manufacturing and selling cash management systems to retailers. Initially, a group of investors owned only one of the defendants, but, seeing a business opportunity to develop and sell a premium cash management system, they formed the plaintiff, a Delaware limited liability company ("LLC"), as a subsidiary of one of the defendants to pursue that opportunity without dragging down that defendant's revenues and taxing its resources. When a financial buyer offered to buy both businesses, the investors declined to sell the plaintiff subsidiary, but accepted an offer to purchase only the parent company. The parties separated the parent and subsidiary and negotiated several contracts to govern their collaborative relationship moving forward.

This action arises from the deterioration of that collaborative relationship into a competitive one, in which the plaintiff alleges the competition occurred sooner than contractual non-competition and non-solicitation provisions permitted. The plaintiff also alleges various related breaches of confidentiality and licensing agreements for which they seek both equitable and monetary relief. The defendants deny the plaintiff's claims and assert counterclaims seeking a declaratory judgment that the parties' software license agreement was perpetual in duration. Both parties seek legal fees and expenses under the controlling Texas law.

I presided over a four-day trial. This Memorandum Opinion contains my post-trial findings of fact and conclusions of law as to the plaintiff's breach of contract claims and the defendants' various counterclaims. For the reasons stated herein, I conclude that the defendants did breach an enforceable non-competition provision and, on that basis, grant

the plaintiff injunctive relief. I also conclude that the defendants misused the plaintiff's confidential information in breach of various contracts and grant the plaintiff's request for monetary damages. Further, I grant the defendants' request for a declaration that the term of the parties' software license agreement is at least twenty years. Finally, I award both parties a portion of attorneys' fees and expenses based on their respective successes in this action, as permitted by Texas law.

## I. BACKGROUND[1]

Around 1995, the Southland Corporation wholly owned Plaintiff Tidel Engineering and 7-Eleven. Tidel Engineering's core product lines included timed-access cash controllers ("TACC units") and other miscellaneous equipment to support 7-Eleven stores. Southland divested its assets when its chairman died, and Tidel Engineering put its cash security business up for auction. Tidel Engineering's cash security business comprised three legacy TACC units and the Sentinel, Tidel Engineering's first-generation Smart Safe unit.

A Smart Safe is a cash management system with a note validator on the front of it. Like a vending machine, a note validator accepts a note and accounts for it, registers it, and puts it into a depository box. In retail stores, a Smart Safe typically sits at the point of purchase underneath the registers. Notes, either one at a time or in bulk, are fed into

---

[1] Citations to testimony presented at trial are in the form "Tr. # (X)" with "X" representing the surname of the speaker, if not clear from the text. Exhibits are cited as "JX #." After being identified initially, individuals are referenced herein by their surnames without regard to formal titles such as "Dr." No disrespect is intended.

the Smart Safe, which accounts for them electronically. At the end of the day, the retailer no longer pulls out money to count by hand. The Smart Safe stacks cash in a deposit cassette. Smart Safes also accept various media such as checks, stored in a secure area with cassettes, that an armored car will pick up, and coupons.

The armored car industry started the Smart Safe business. An armored car company monitors remotely how much money a specific customer has deposited in its Smart Safe's cassette. Instead of scheduling pickup several days a week, the armored car came only when the company saw the cassette almost was filled to capacity. Remote monitoring facilitated supplying retailers with provisional credit. Rather than a retailer waiting two or three days between scheduled pickups to receive credit for the cash in its safe, the retailer would receive credit every day for the cash deposited the day before.

In or around 2002, Group 4 Securicor ("G4S"), one of the largest cash in transit and security companies in the world, announced a request for quotations to provide Smart Safes internationally. Tidel Engineering bid on and won the contract. In or around 2006, Tidel Engineering still had only four products. After Laurus Capital backed Tidel Engineering's CEO Mark Levenick and CFO Jeff Galgano in a management-led buyout, Tidel Engineering re-engineered the Sentinel to appeal to the armored car companies. In or around 2007, however, G4S asked Tidel Engineering to build a high-speed coin recycler for European coins and offered to pay for its development. Tidel Engineering agreed and produced the first prototypes in June or July of 2008.

Having seen the European coin recycler project, Tidel Engineering's capital partners decided to move forward with developing a full coin and note recycler—the

3

complete cash room solution—for the U.S. market. The business advantage of a recycler is that it enables a retailer to automate its cash room and reduce labor hours. Retailers with no Smart Safe typically hand-count tills in the morning for use in registers during the day. All day, money goes between the registers and the safe, which has to be opened and money accounted for manually. At the end of the day, drawers come back from the registers to be counted manually and reconciled for shortages. Then, in a cash room, end-of-day deposits are counted. The process starts over the next day.

Smart Safes with one-way note validators automate some of the process. Deposit cassettes store notes until someone removes them from the machine. A note recycler, however, accepts notes at a higher speed and not only validates them but also separates and stores them in either drums or cassettes, which allows the notes to be brought back out upon request or left in a designated deposit cassette that remains one-way.

To automate the process fully, Tidel Engineering developed a full coin and note recycler to check out cash drawers automatically. A retailer asks the machine for a start-of-day till and the machine dispenses it in a matter of seconds with absolute precision. At the end of the day, the retailer inserts the money back into the machine and the machine accepts it, authenticates it, and stages it for the next person, thus eliminating all manual counting. Tidel Engineering's capital investors did not want to drain the company's resources and earnings to develop this higher-priced product, so they formed and funded independently Tidel Revolution, LLC in or around May 2009 to develop the Revolution recycler separately. The two companies, however, operated seamlessly until 2011.

## A. The Parties and Relevant Non-Parties

Defendants Sentinel Technologies, Inc. ("Sentinel") and Tidel, Inc., both Delaware corporations, are holding companies of Defendant Tidel Engineering, L.P. ("Tidel Engineering"), a Texas limited partnership ("LP") (together with Sentinel and Tidel, Inc., "Tidel") and cash management system retailer with more than thirty years of experience in the industry. The Tidel entities are also Counterclaim Plaintiffs in this action. Tidel formed Tidel Revolution as a subsidiary in May 2009. Until 2011, Tidel and Tidel Revolution shared a board, management, and operations, administrative, and engineering personnel. In November 2011, Tidel and Tidel Revolution formally were separated into two entities, and Tidel Revolution became New Tidel Revolution, LLC.

Plaintiff and Counterclaim Defendant, Revolution Retail Systems, LLC ("Revolution"), is the successor entity to New Tidel Revolution and, like Tidel, is a cash management system retailer.

Mark Levenick is the Chairman and CEO of Revolution. He joined Tidel Engineering in 1988 as a sales trainee, became president in 1993, and CEO in 1994. Levenick was also Tidel Revolution's first CEO and continued serving both companies in that capacity after their separation in 2011. Tidel discharged Levenick in late 2013.

Gary Landry replaced Levenick as Tidel's CEO and still serves in that role. Landry joined Tidel's Board in January 2013. Before joining Tidel, Landry worked for Brinks, an armored car company, for twenty-three years, including as Executive Vice President of International Business for the last several years.

5

Alex Beregovsky worked for Vector Capital, a private equity firm from San Francisco specialized in investing in middle market technology companies. He initiated a transaction in which Vector acquired Tidel in 2011. Beregovsky joined the Tidel Board after that transaction closed.

Graham Partners acquired Tidel from Vector in February 2015.

### B. Facts

### 1. Vector agrees to buy Tidel, but not Revolution

In 2011, Vector proposed a term sheet to acquire Tidel and its subsidiary, Revolution. Tidel's majority stockholder, however, had high expectations for Revolution's business prospects, and Tidel's Board rejected Vector's offer. Vector later offered to acquire only Tidel, which Tidel accepted. Tidel and Revolution formally were separated into two independent entities as part of that transaction, with Tidel's former majority stockholder retaining majority control of Revolution. On November 2, 2011, the Tidel and Revolution parties executed a series of agreements governing their relationship moving forward. These agreements included the Securities Purchase Agreement, the Manufacturing Services Agreement (the "Manufacturing Agreement"), the Cross License Agreement, and the Administrative Services Agreement (the "Services Agreement").

Section 7.9 of the Securities Purchase Agreement contains Non-Competition and Non-Solicitation provisions delineating two otherwise competitive businesses in which Tidel and Revolution each would operate, respectively and exclusively, until the end of a

6

Non-Competition Period.[2] The Non-Competition Period was to last through the later of: (1) the date that was three years from the Securities Purchase Agreement's Closing Date—*i.e.*, November 2, 2014; or (2) the termination of the Manufacturing Agreement by its terms.[3] Through Section 7.9, the parties exchanged broad reciprocal covenants not to compete in each other's specifically delineated and defined "Competitive Business." Revolution promised Tidel in Section 7.9(a) that, during the Non-Competition Period, it would not "directly or indirectly . . . engage in or propose to engage in the business of developing, marketing, manufacturing or selling equipment or cash management systems or equipment that have a selling price of less than $35,000 per unit . . . ," defined as a "Sentinel Competitive Business."[4] By a corresponding covenant in Section 7.9(c), Tidel promised that it would not "directly or indirectly . . . engage in or propose to engage in the business of developing, marketing or manufacturing systems that have a selling price of $35,000 or more per unit . . . ," defined as a "Revolution Competitive Business."[5] After making the permitted calculations and adjustments for inflation as of November 2014, a "Revolution Competitive Business" would comprise cash management systems developed, marketed, or manufactured by Tidel to have a selling price of $37,030.25 (the "Inflation Adjusted Price Line") or more.

---

[2]     JX 3.

[3]     *See infra* note 9.

[4]     JX 3.

[5]     *Id.* § 7.9(c).

7

Similar to the Non-Competition provisions, the parties also exchanged reciprocal covenants not to, "directly or indirectly," "call on" or "solicit" each other's customers during the Non-Competition Period in connection with each other's Competitive Business.[6]

The Manufacturing Agreement set forth the terms under which Tidel would continue manufacturing Revolution's products and permitted the parties to terminate the agreement by its terms. Revolution had certain exclusive ownership rights in and to intellectual property, including software and Solidworks drawings, used in the systems assembled under the Manufacturing Agreement and Services Agreement.[7] The Manufacturing Agreement restricted each party's use of the other's "Confidential Information," which each party agreed not to use except "as necessary to perform its obligations and exercise its rights under this Agreement . . . ."[8] The Manufacturing Agreement's "term" is prescribed in Section 11 of that agreement.[9] The parties' obligations respecting Confidential Information expressly survived the end of the term, and each agreed that at the end of the term it would "promptly deliver" "all copies" of "any of the other party's proprietary information in its possession, including but not

---

[6]     *Id.* § 7.9(d).

[7]     JX 4, 5.

[8]     JX 4 § 9(a); JX 5 § 6.

[9]     "The term of this [Manufacturing] Agreement shall commence as of the date hereof and shall continue until the fifth (5th) anniversary of the date hereof unless earlier terminated pursuant to the terms of this Section 11." JX 4 § 11(a).

limited to, Confidential Information . . . ."[10]  On February 15, 2014, pursuant to the terms of the Manufacturing Agreement, Tidel provided Revolution one year advance notice that it was terminating that agreement and the corresponding Non-Competition Period on February 15, 2015.[11]

The Services Agreement set forth the terms under which Sentinel (through Tidel) would provide certain administrative services to Revolution in part by sharing employees. To that end, Exhibit A to the Services Agreement set forth the names of Sentinel employees and a percentage of time that each employee would allocate to Sentinel for 2012 and 2013.[12]  The Services Agreement contained mutual obligations relating to Confidential Information that were similar to those in the Manufacturing Agreement and survived the Services Agreement's September 30, 2013 expiration.[13]

The Cross License Agreement addressed each party's ability to use certain intellectual property rights owned by Revolution and used by Tidel in the ordinary course of its business as of November 2, 2011, defined and referred to as "Other Licensed Intellectual Property."[14]  On September 5, 2014, however, Revolution and Tidel executed

---

[10]    JX 4 § 11.

[11]    Defs.' Answer to First Am. Verified Compl. & Am. Counterclaim ¶ 9, Docket Item ("D.I.") 74.

[12]    *See* JX 5, Exh. A (including Levenick, Flynt Moreland, and CFO Galgano, among others).  For the avoidance of doubt, Exhibit B set forth the names of individuals whose time was allocated to Revolution entirely.  JX 5, Exh. B.

[13]    JX 5, §§ 3, 6.

[14]    JX 6.

a "release" in which the parties agreed, among other things, that the term Other Licensed Intellectual Property, as used in the Cross License Agreement, included "certain design, development and engineering documents and models that are marked or otherwise designated as Tidel documents" that "[Revolution] and Tidel share . . . ."[15]

### 2. The Software License Agreement enables collaboration

Vector continued to operate Tidel and Revolution with overlapping boards, officers, and employees, including CEO Levenick and CFO Galgano, during 2012 and 2013. Levenick and Moreland, Tidel's Executive Vice President of Engineering and IT, conceived of the Series 5 cash management system, a predecessor to the R50 that is at the center of this dispute, in either late 2012 or early 2013. The Inflation Adjusted Price Line was in effect at that time, and as long as Tidel and Revolution were subject to it, neither could fully meet the business requirements of certain customers who: (1) needed cash management systems both above and below the price line; and (2) desired a common interface for their cash management systems. The parties, through Levenick and Moreland, identified a need to work together to provide a solution for those customers or risk losing them to a competitor who could.[16] Thus, the parties executed the Software and Cross License Agreement in March 2013 (the "Software License Agreement") to

---

[15]   DX 100 § 1 (and first WHEREAS); JX 6 § 2.3.

[16]   The idea for a software license arose from the desire for Revolution and Tidel to get 100% of the sales to Wal-Mart and Walgreens, with Revolution getting a "90/10" split of Wal-Mart and Tidel getting a "90/10" split of Walgreens. Tr. 67-68, 73, 74 (Levenick).

10

enable Tidel to sell products below the price line using the same user interface software that Revolution installed in products it sold above the price line. Levenick and Landry described the Software License Agreement, executed on March 29, 2013, as part of the parties' collaborative business relationship.

### 3. Tidel and Revolution's relationship sours

The Services Agreement expired by its terms on September 30, 2013. Beregovsky and Tidel confirmed with Revolution that the "[t]wo years are up . . . ," the Services Agreement was completed, and Tidel had "compli[ed] [with] all Revolution divestiture elements."[17] Later that month, Levenick and Moreland agreed on the coin sorter capacities necessary on Tidel's Series 5 to get Walgreens' business below the price line.[18] Levenick wrote to Fujitsu, a vendor, to request help with targeting Tidel's Series 5 at a "mid-tier" retail market, explaining Tidel and Revolution's price line collaboration and how the software license fits into it.[19]

On November 11, 2013, Levenick made a presentation regarding the proposed Series 5 specifications, functionality, and "$35k" price for approval by Tidel's Board.[20]

---

[17]  PX 57; Tr. 746 (Galgano).

[18]  DX 47-49.

[19]  DX 54 (Levenick asking Fujitsu for a price reduction on its 750 recycling platform for Tidel's use in a recycler for "mid-tier" retail customers like Whole Foods, Wal-Mart, and Walgreens); Tr. 80-83 (Levenick explaining his request for Fujitsu to reduce the price of its 750 model from $15,000 to $11,000); DX 51 (Levenick informing Beregovsky that he had "been hammering Fujitsu *HARD* for pricing reductions on their recyclers which we may use in the Series 5 system").

[20]  DX 52, 55.

Thus, the Series 5 would target a market with a higher price point than Tidel's Smart Safes, which were priced around $5,000.[21] Several days later, Beregovsky, Landry, Galgano and Darren Taylor, Tidel's Executive Vice President of Global Business Development—without then-CEO Levenick—discussed a Bank of America/G4S opportunity for "thousands" of Series 5 sales, agreed to accelerate the development of two different versions of the Series 5—a "mid next year" version at approximately 30% gross margins and a "further version" with a new coin sorter at approximately 40% gross margins, complained about the $36,000 "sales price" restriction, and agreed upon the need to negotiate raising the price line to "get much higher margins."[22] In that same conversation, Taylor suggested that Tidel should leverage Revolution's dependence on their manufacturing relationship to negotiate an increase in the price line.[23] Within a month, Beregovsky and Tidel replaced Levenick as CEO with Landry, and Revolution's Board replaced Levenick with Mike Hudson, Revolution's former General Manager.[24] Later, Beregovsky directed Tidel's management to find a way to "get much higher margins . . . ," because "[w]hen we go and sell Tidel, we will obviously tout our high-end

---

[21]    Tr. 759 (Landry).

[22]    PX 62 at 3 (confirming that the differences between the two versions related primarily to the coin sorter and note recycler).

[23]    *Id.* at 2.

[24]    Tr. 87, 89-90 (Levenick); JX 5, Exh. B.

product and its growth potential. However, if that product is the lowest margin product in our line-up, it detracts a lot from the message."[25]

On January 28, 2014, Tidel and Revolution met at Tidel's invitation, and Taylor, Landry, and Moreland requested: (1) Revolution's consent to use Revolution's "coin sorter" intellectual property for a Series 5 "pilot" "whilst [they] develop [their] final Series 5 product"; and (2) an increase in the price line to $42,500 to achieve the margins normally expected from a product.[26] The parties met again on February 14, 2014 and Tidel renewed its request for Revolution's support in commencing the proposed product development, but Revolution declined. Immediately thereafter, Tidel canceled the Manufacturing Agreement—effective, by its terms, February 15, 2015. According to Landry, Tidel terminated the Manufacturing Agreement in part because of its small margins and the disruption it caused to Tidel's core business.[27] Tidel earned a profit margin of 7% on the contract manufacturing service that it performed exclusively for Revolution, as opposed to a higher average profit margin on other products.[28] The contract was likely to be both a drain and a distraction: if Revolution became successful

---

[25] PX 62. According to Landry, Beregovsky directed his communication to Taylor and was "always banging on [Tidel] about gross margins." Tr. 445, 499 (explaining that Beregovsky and Vector "had a false sense of what gross margins could be . . . [and] wanted to see more money quick," and "were used to 80 percent gross margin businesses . . .").

[26] DX 63; Tr. 499 (Landry).

[27] Tr. 849 (Taylor).

[28] Tr. 428 (Landry).

13

and required Tidel to manufacture many units, it would drain Tidel's resources; if Revolution was not successful, the contract still would distract Tidel from its core business with wider profit margins.[29]

### 4. Tidel prepares itself to be sold and tests the R50 product market

On March 10, 2014, Tidel began referencing the Series 5 as the "R50" when providing preliminary technical specifications. Those specifications included Tidel's plan to "[u]se the Glory Mach 6" coin sorter, which processes coins twice as fast as the Glory Mach 3.[30] Tidel continued, however, to refer to the R50 as the Series 5 for several months, as described below. On May 13, 2014, Tidel's Board voted to approve a "company sale process" with a Series 5 plan indicating a "$35k-$45k price range."[31] Later that month, Taylor sought Moreland's assistance in pricing the Series 5 assuming the slower Glory Mach 3 coin sorter.[32] Tidel hired Harris Williams, an investment bank, to help prepare and market Tidel for sale.[33] Harris Williams conducted a market study and prepared several business plans, including a Series 5 business plan, which Defendants referred to as sell-side documents.[34]

---

[29]    Tr. 429 (Landry); Tr. 850 (Taylor).

[30]    DX 75 (Glory Mach 6 processes 3,000 coins per minute); DX 85 (Glory Mach 3 processes 1,500 coins per minute)

[31]    DX 81.

[32]    PX 89.

[33]    Tr. 450 (Landry).

[34]    Tr. 451-52.

In June and July 2014, Galgano, Taylor, and Landry began communicating about achieving higher gross margins for the Series 5 with "new pricing."[35] Taylor wrote, for example: "It would be interesting to see what the higher price would be . . . with a Mach 6 [coin sorter and] . . . [s]tandardization across all coin lines."[36] Taylor continued: "I think we could get a higher price maybe? I can ask G4S and Armaguard their thoughts on a higher price for higher spec . . . ."[37] Specifically, on June 9, 2014, Taylor contacted one of Brink's customers in the United States regarding a Series 5 sales opportunity and advised them that "[n]ote and coin recycling will be $40k."[38] On June 19, 2014, Taylor confirmed that pricing for the Series 5 would be $40,000 in FY15 and $41,875 in FY16 and beyond.[39] Then, in a "Tidel Series 5 Business Draft Plan-Draft Version x-05" dated June 27, 2014, Tidel indicated the Series 5 will use a "Mach 3 Coin Sorter," have a "unit MSRP of $40k," and have "planned MSRP increases to $41,875."[40]

On July 21, 2014, Taylor and Landry discussed new gross margins "if we go to Mach 6, with new pricing," and Taylor proposed a Series 5 with a "higher price for a

---

[35] DX 90.

[36] *Id.*

[37] *Id.*

[38] JX 15.

[39] JX 16.

[40] PX 94.

higher spec . . ." using a "Mach 6 [coin sorter] over a Money Controls sorter . . . ."[41]  That same day, Taylor relayed that information to G4S and Armaguard in separate emails, saying, "[w]e have a working market price of $40k and are planning on using a Mach 3 sorter, if we switched to a Mach 6 to allow quicker fill time etc. and increased the price to $42.5k(ish) what would your thoughts be?"[42]  Then, on July 24, Galgano told Harris Williams that "[w]e need to change Series 5 price to $42500."[43]  A sales strategy overview titled "Tidel Strategy Overview-July 2014 Update" indicated that Tidel "expect[ed] to sell the Series 5 for ~$42,500 and generate ~40% gross margin[s]," "[t]o be released [January 2015]," and "to fill a void in market solutions between smart safes and high end recyclers currently available."[44]  Galgano and Taylor drafted the Tidel Strategy Summary at the direction of Tidel's Board using a $42,500 price[45] for two purposes: (1) "commercialization" of the R50 by Tidel; and (2) use in connection with the potential sale of the company.[46]  Tidel's Board, through Beregovsky, oversaw efforts

---

[41]    DX 90.

[42]    DX 91; PX 106-107.

[43]    JX 17.

[44]    PX 97; DX 92.  A Series 5 business plan dated July 23, 2014 also states that, "[f]or Tidel, the Series 5 will move us upstream into . . . larger, higher cash volume retail formats with a more complex, higher price point solution."  DX 92 at TIDEL00012220.

[45]    Tr. 769 (Galgano); PX 123.

[46]    Tr. 771-72 (Galgano discussing dual purposes); *see also* Tr. 769 (Management prepared the plan "so a potential buyer coming in would see [they] had a proper business strategy and that it would help [them] sell the company . . . .").

16

during July and August 2014 to draft a "Series 5 Business Plan" for the same two purposes.[47]

Additional documents corroborated the move to a higher price point through the fall. On August 18, 2014, a Series 5 business plan stated that the "Series 5 will be priced at $42.5k" in 2015, the Mach 3 coin sorter will change to a Mach 6 coin sorter, and the planned price will increase to $44,375 in 2016.[48] Tidel also began using the R50 name consistently around this time. On November 5, 2014, a Tidel Board deck indicated that the R50 formally would launch January 2015 and "utilize . . . Mach 6" with a price "TBD."[49] At the same time, however, a "Confidential Information Memorandum," which was one of Tidel's sell-side documents created for a potential transaction with Graham Partners, described the R50 and promoted its business case using a $42,500 list price.[50] Taylor and Landry discussed similar pricing on November 13, 2014 when they told one of Brinks's U.S. customers that the R50's price point is $42,500[51] and told G4S

---

[47]    DX 116; Tr. 772, 765-66 (Galgano). The Series 5 Business Plan stated that it "will incorporate the Mach 6 Coin Sorter," and "will be priced at an [average selling price] of $42.5k . . . ." DX 116. It further confirmed "discussions with several major retailers . . ." and a January 2015 "official launch" and provided average selling price projections beginning at $42,500 in 2015 and increasing to $44,375 throughout the period from 2016 to 2019. *Id.*

[48]    DX 97 at 4, 13; DX 116.

[49]    DX 104.

[50]    PX 7 at 25, 42.

[51]    DX 105.

it will be $41,250 per device.[52]   Later, on December 2, 2014, Taylor advised another customer that the "National Pricing Quote" for "high volume" R50 purchases is $46,250 and that price "would be honored from the first unit."[53]

Tidel debuted and promoted the R50 at trade shows beginning in January 2015. On January 11, 2015, Tidel exhibited the R50 at the National Retail Federation trade show.[54]  On January 27, 2015, Tidel listed the R50 at $46,000 in a price comparison with competitor systems,[55] and Taylor and Galgano quoted a "sale price" for G4S of $41,250.[56]  Tidel exhibited the R50 again at the National Grocer's Association trade show on February 9, 2015.[57]  On February 12, 2015, Galgano confirmed the R50 in Tidel's budget "@ $42,500" "sale price."[58]

The Non-Competition Period ended three days later on February 15, 2015.

---

[52]    JX 18.

[53]    DX 107-108.

[54]    DX 133 ¶ 34.

[55]    PX 185.

[56]    DX 117.

[57]    PX 199.

[58]    PX 192.  Taylor admitted that he engaged in soliciting and marketing activities and sales efforts in connection with the R50 between June 2014 and February 15, 2015.  Tr. 931.  During those efforts, Taylor indicated, offered, quoted, or proposed to current and prospective customers of both Revolution and Tidel prices for the R50, variously, at: "mid $40's" (PX 163); $42,500 (DX 105); $41,250 (DX 117, JX 18); "region of $40k" (DX 83); $46,000 (PX 185); and $46,260 (DX 107).

### 5. Vector sells Tidel to Graham Partners

Graham Partners acquired all of Tidel's stock on February 26, 2015.[59] Rob Newbold, a managing principal at Graham Partners, explained that the main driver of Graham Partners's investment in Tidel was its Smart Safe product lines, not the R50.[60] According to Newbold, Graham Partners viewed Tidel's Series 3 as a lower-end version of the Series 4 because it has fewer bells and whistles and sold for a lower price point. Graham Partners viewed the R50 as a different type of machine because it was a cash recycler, rather than a Smart Safe, and, as such, sold for a significantly higher price point. Newbold expressed his understanding that the R50 was designed to sell to a different set of customers, such as larger retailers than the fast food restaurants and convenience stores that purchase Smart Safes. Further, Newbold understood that the distribution channels for recyclers were different because the armored car companies like Brinks tended to be the dominant path to market for Smart Safes, but not for recyclers.[61]

### C. Procedural History

Revolution commenced this breach of contract action against Defendants, Sentinel Technologies, Inc., Tidel, Inc., and Tidel Engineering L.P., on February 2, 2015, seeking initially a temporary restraining order and preliminary injunction. Revolution later withdrew that application in deference to sworn affidavits submitted on behalf of

---

[59]     Tr. 535 (Landry).

[60]     Tr. 782.

[61]     Tr. 783-86.

19

Defendants by Landry, Galgano, and Moreland.[62]  Revolution's Amended Complaint seeks injunctive, declaratory, and monetary relief related to alleged breaches of five contracts, including: (1) non-competition and non-solicitation provisions of the Securities Purchase Agreement; and (2) confidentiality provisions in the Manufacturing Agreement, Services Agreement, and Software License Agreement.  Revolution also seeks a declaration that the Software License Agreement terminated effective February 15, 2015.

Tidel filed its Answer to the First Amended Verified Complaint and Amended Counterclaims on March 13, 2015, denying Revolution's claims.  Through its Amended Counterclaims, Tidel seeks a declaratory judgment that the license Revolution granted Tidel in the Software License Agreement is perpetual, or, in the alternative, extends for at least the length of the twenty-year license fee period.

After granting a motion to expedite, I conducted a four-day trial in this matter on June 2 through 5, 2015.  I heard post-trial arguments on August 20, 2015.

### D.     Parties' Contentions

Revolution argues that the parties agreed to restrictive covenants that were "necessary" and "reasonable in all respects" as part of a business-to-business sale of securities in November 2011, which Tidel breached by: (1) engaging directly in the business of developing and marketing the R50 during the Non-Competition Period at selling prices above $37,030; and (2) engaging, or proposing to engage, directly and

---

[62]     Certain sworn statements in the Moreland affidavit were recanted during discovery and at trial.

indirectly, in the business of developing and marketing the R50 as a "turnkey" cash management system priced above the price line.

Tidel denies that it ever breached the Securities Purchase Agreement by developing or pricing the R50 to be sold above the price line. Instead, Tidel contends that its representatives engaged in permitted price negotiations and preliminary market research and that its efforts to sell itself, including production of certain sell-side documents, did not violate the Securities Purchase Agreement. Alternatively, Tidel avers that the non-competition provision of the Securities Purchase Agreement, as interpreted by Revolution, is unreasonable and does not advance legitimate economic interests and, therefore, is unenforceable.

Tidel also argues that the plain language of the Software License Agreement establishes a perpetual and irrevocable license and that, to the extent extrinsic evidence is admissible, it supports such an interpretation. Revolution disagrees, arguing that the circumstances surrounding the Software License Agreement's formation, such as the parties' then-collaborative relationship, establish that the duration of the license granted was limited in scope by the term of the Manufacturing Agreement. Revolution contends, therefore, that Tidel's license to use Revolution's software under the Software License Agreement terminated on February 15, 2015.

Revolution also avers that several of the contracts between Revolution and Tidel obligated Tidel not to use Revolution's confidential information other than for purposes of fulfilling contractual obligations to Revolution. In that regard, Revolution emphasizes that Moreland admitted at trial that Tidel used Revolution's confidential information,

including Revolution's software and Solidworks files, to develop the R50 and its numerous parts, including the top cover, the coin return bin, various mounting brackets, and the door stop.

Tidel contends that Revolution failed to satisfy its burden of proving the elements of its misappropriation of confidential information claim because Tidel reserved the right to use two of the four Solidworks models in question, a third was dropped from the final production version, the shapes of the parts were driven primarily by functionality, and Revolution offered no evidence quantifying the time or money that Tidel allegedly saved by relying on the Solidworks models.

Finally, both parties dispute whether and to what extent the other is entitled to shift its fees under Texas law.

## II.    ANALYSIS

### A.    Legal Standard

Plaintiffs, as well as Counterclaim-Plaintiffs, have the burden of proving each element, including damages, of each of their causes of action against each Defendant or Counterclaim-Defendant, as the case may be, by a preponderance of the evidence.[63] Proof by a preponderance of the evidence means proof that something is more likely than

---

[63]    *In re Genelux Corp.*, -- A.3d ---, 2015 WL 6393840, at *19 (Del. Ch. Oct. 22, 2015).

22

not.[64] "By implication, the preponderance of the evidence standard also means that if the evidence is in equipoise, Plaintiffs lose."[65]

### B. Tidel Breached the Securities Purchase Agreement

To prevail on a breach of contract claim, Revolution must prove: (1) the existence of a contract; (2) the breach of an obligation imposed by that contract; and (3) damages suffered as a result of that breach.[66] Texas law is in accord.[67] Delaware law adheres to an objective theory of contracts, under which a court will not consider extrinsic evidence "to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity" when the relevant contract terms are unambiguous.[68] Contract terms are not

---

[64] *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (quoting *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002)).

[65] *2009 Caiola Family Tr. v. PWA, LLC*, 2015 WL 6007596, at *12 (Del. Ch. Oct. 14, 2015); *OptimisCorp v. Waite*, 2015 WL 5147038, at *55 (Del. Ch. Aug. 26, 2015).

[66] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003) (citing *Winston v. Mandor*, 710 A.2d 835, 840 (Del. Ch. 1997)); *Moore Bus. Forms, Inc. v. Cordant Hldgs. Corp.*, 1995 WL 662685, at *7 (Del. Ch. Nov. 2, 1995); *Goodrich v. E.F. Hutton Gp., Inc.*, 542 A.2d 1200, 1203-04 (Del. Ch. 1988); WRIGHT & MILLER, 5 FEDERAL PRACTICE AND PROCEDURE CIVIL § 1235 (3d ed. 2015).

[67] *Sharifi v. Steen Auto., LLC*, 370 S.W.3d 126, 140 (Tex. App. 2012) ("A successful breach of contract claim requires proof of the following elements: (1) a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." (citing *Petras v. Criswell*, 248 S.W.3d 471, 477 (Tex. App. 2008))).

[68] *Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 4054473, at *2 (Del. Ch. Nov. 8, 2007) (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1128,

23

ambiguous merely because the parties to the contract disagree on their meaning;[69] rather, the Court "stand[s] in the shoes of an objectively reasonable third-party observer," and determines whether the contract language is unmistakably clear.[70] The interpretation of a contract is a question of law.[71] If there is more than one reasonable construction of contractual language, then the contract is ambiguous.[72] Contractual language, however, "is not ambiguous simply because the parties disagree on its meaning."[73] Instead, the court will apply standard principles and canons of construction in construing the contract.

To be enforceable, Revolution must establish by clear and convincing evidence that the non-competition provision at issue is: (1) reasonable in geographic scope and temporal duration; (2) advances a legitimate economic interest; and (3) survives a balance

---

1232-33 (Del. 1997)). The Securities Purchase Agreement is governed by Delaware law. The other four relevant agreements are subject to Texas law.

[69] *Id.*

[70] *Seidensticker*, 2007 WL 4054473, at *2 (quoting *Dittrick v. Chalfant*, 2007 WL 1039548, at *4 (Del. Ch. Apr. 4, 2007)).

[71] *See, e.g.*, *Seidensticker*, 2007 WL 4054473, at *2 (citing *HIFN, Inc. v. Intel Corp.*, 2007 WL 1309376, at *9 (Del. Ch. May 2, 2007)); *see also AHS N.M. Hldgs., Inc. v. Healthsource, Inc.*, 2007 WL 431051, at *3 (Del. Ch. Feb. 2, 2007) ("Under general principles of contract law, interpretation of contractual language is purely a question of law.").

[72] *VLIW Tech.*, 840 A.2d at 615 ("Ambiguity exists 'when the provisions in controversy are reasonably or fairly susceptible of different interpretations.'" (quoting *Vanderbilt Income & Growth Assocs. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996))).

[73] *E.I. du Pont de Nemours & Co., Inc. v. Allstate Ins. Co.*, 693 A.2d 1059, 1061 (Del. 1997).

of the equities.[74] Tidel contends that Section 7.9 is unenforceable because the scope of the non-compete provision is unreasonable and Revolution failed to prove otherwise by clear and convincing evidence. A "less searching" inquiry into the enforceability of restrictive covenants is contemplated, however, where, as here, sophisticated parties contract to exchange securities.[75] Further, Tidel affirmed that "the restrictions contained in this Section 7.9 are reasonable in all respects (including, without limitation, with respect to the subject matter, time period and geographical area) . . . ," and "necessary" to protect each parties' securities and goodwill.[76] Each party represented that it "would not have consummated the transactions . . . without the restrictions contained in this Section 7.9."[77] The evidence demonstrates, therefore, that Section 7.9 advances legitimate economic interests of not only Revolution but also Tidel—*i.e.*, "we, on the Tidel side, were also concerned about Revolution competing with Tidel and about Revolution having a lot of knowledge about Tidel's systems."[78] The corporate history of Revolution

---

[74] *Concord Steel, Inc. v. Wilm. Steel Processing Co.*, 2008 WL 902406, at *4 (Del. Ch. Apr. 3, 2008).

[75] *Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *19 (Del. Ch. July 22, 2015).

[76] JX 3 § 7.9(i).

[77] *Id.*

[78] Tr. 717-18 (Beregovsky). Beregovsky's testimony comports with the actions of Tidel's owners both before and after Vector: in both contexts, the owners viewed the Smart Safe and recycler businesses as separate economically. For the owner who sold Tidel to Vector, that distinction justified forming Tidel Revolution to keep the recycler business separate from Tidel's Smart Safe business. For Graham Partners, the distinction justified purchasing Tidel based on its Smart Safe

alone justifies the price line: Revolution was formed to develop the higher-priced recycler market without competing for Tidel's resources or dragging down its revenues, and Tidel's prior owner negotiated the price line to protect its business decision to keep Revolution instead of selling it to Vector. Thus, I conclude that Revolution proved by clear and convincing evidence that the restrictive covenants at issue in Section 7.9 of the Securities Purchase Agreement are enforceable.[79]

This Court has observed that where "[r]estrictive covenants are carefully negotiated," "our law requires that the unambiguous terms be given effect."[80] Where a party negotiates for a contractual restriction, "it is stuck with that," and "cannot, as an 'oh by the way,'" claim that a broader or lesser restriction must apply.[81] Tidel failed to advance a convincing argument that the relevant language in Section 7.9 is ambiguous.[82] Thus, the parties are bound by the unambiguous negotiated language of the mutual

---

business alone and without regard for Vector's then-ongoing efforts to develop a recycler to capture that market.

[79] I therefore reject Tidel's argument that balancing the equities "overwhelmingly" tilts in its favor because Revolution seeks only the "illegitimate benefit" of protecting itself from competition with Tidel through "a non-compete of infinite duration and boundless scope . . . ." Revolution seeks only to enforce the full scope and duration of the same mutually applicable competitive restrictions it honored to Tidel's benefit.

[80] *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1024 (Del. Ch. 2006).

[81] *Id.* at 1025.

[82] In response to Revolution's arguments that certain of Tidel's acts during the Non-Competition Period constituted breaches, Tidel avers that its actions were permitted by Section 7.9. I address this argument *infra*.

covenants and provisions to which they agreed in November 2011. In Section 7.9(c) of the Securities Purchase Agreement, Tidel covenants not to compete with Revolution during the Non-Competition Period as follows:

> During the Non-Competition Period, Buyer [Tidel] agrees, on behalf of itself and its Affiliates, including the Company [Sentinel] and its Subsidiaries, that it shall not, anywhere in the world, directly or indirectly, either for itself or for any other Person (i) own, operate, manage, control, engage in, participate in, invest in, permit its name to be used by, act as consultant or advisor to, render services for (alone or in association with any Person) or otherwise assist in any manner, any Person that engages in or owns, invests in, operates, manages or controls any venture or enterprise which directly or indirectly engages or proposes to engage in the business of developing, marketing, or manufacturing systems that have a selling price of $35,000 or more per unit (or a selling price in a foreign currency of $35,000 or more per unit based upon applicable foreign exchange rates) (which such selling price shall be adjusted throughout the Non-Competition Period for inflation in the applicable geographic location of the purchaser) (a "*Revolution Competitive Business*").[83]

The competitive restrictions contained in Section 7.9 are expansive, evidencing an attempt to cover every conceivable escape route for potentially competitive conduct. These restrictions include far more than verifiable sales; they encompass almost all other aspects of potentially competitive business activity in which Tidel and Revolution engage regularly, *i.e.*, designing, developing, marketing, and manufacturing cash management systems. Accordingly, Section 7.9 prohibited both Tidel and Revolution from "the business of developing, marketing or manufacturing systems" with a selling price above

---

[83]     JX 3 § 7.9(c).

or below, as the case may be, the Inflation Adjusted Price Line. This restriction applied whether Tidel or Revolution was: engaging in such business; proposing to engage in it; investing in it; undertaking it for itself or for any other person; otherwise assisting investing in, or controlling, in any manner any person, venture, or enterprise engaging in it or proposing to engage in it; calling on, soliciting or serving customers or other business relations in connection with it, or interfering in any way with the relationships involving customers or other business relations in connection with it.[84] Though its language is expansive, I conclude that an objectively reasonable third-party observer would find that Section 7.9's meaning is plain: there can be no running start.

Tidel seeks to rewrite the covenant to prohibit only the actual sale of a cash management system above the price line during the Non-Competition Period, but such a construction relies upon an untenable use of the term "selling price" and creates an absurd result that eviscerates most of Section 7.9's restrictions. Specifically, Tidel argues that it could not have breached the non-competition provision because it never sold a product with a "selling price" above the Inflation Adjusted Price Line during the Non-Competition Period, and the Securities Purchase Agreement not only allowed Tidel to sell itself but contemplated such a sale expressly. Instead, Tidel insists that it engaged in price negotiations permitted by the Securities Purchase Agreement, assembled sell-side documents advertising the sale of itself as a going concern on the assumption that its non-

---

[84] *See e.g.*, JX 3 § 7.9(a)-(d).

competition obligations expired by their terms upon a change of control, and solicited its own customers with respect to the R50 only at a price below the price line.

Tidel's tortured interpretation of Section 7.9 ignores that provision's plain language. For example, Tidel denies breaching Section 7.9, stating, "Revolution presented no evidence that [Tidel] ever sold or agreed to sell the R50 above the [price line] . . . ;"[85] "Landry regularly sought and obtained board approval to continue the R50 project consistent with the agreed price restriction . . . ;"[86] and Tidel "has [only] ever agreed to sell the R50 . . . below the cap," "has only ever formally quoted [a price of $37,030] to prospective buyers for the R50 . . . ," and "has [only] ever accepted purchase orders for the R50 [at] $37,030."[87] Section 7.9, however, prohibits far more than selling, agreeing to sell, quoting formally, and accepting purchase orders for products above the price line. The provision also applies to far more conduct than mere board approval of products above the price line.

Nonetheless, Tidel further contends that Section 7.9 permitted Taylor's negotiations and market research regarding the R50 at prices above the price line.[88] Instead, according to Tidel, Taylor provided "anticipated" and "indicated" price points

---

[85] Defs.' Answering Br. 27.

[86] *Id.* at 28.

[87] *Id.* at 27-28.

[88] Tidel argues that the inclusion of the modifier "selling" in Section 7.9(c) suggests that the use of other price quotations that would not qualify as "selling prices" is permitted under the agreement and that the agreement does not prohibit "market research" or internal, financial modeling.

for the R50 between $40,000 and $46,250 as a negotiating tactic, intending to pull potential buyers up to a final price equal to or just below the price line—*i.e.*, $37,030. Alternatively, Tidel argues that Taylor's discussions with G4S and Armaguard regarding a "working market price of $40k . . . using a Mach 3 sorter" and an increased price of "$42.5k (ish)" with a Mach 6 sorter were nothing more than preliminary market research to verify the pricing assumptions contained in the sell-side documents prepared for potential buyers of Tidel.[89] I do not find Tidel's careful parsing of its previous statements convincing.

The documentary and testimonial record adduced at trial demonstrates by a preponderance of the evidence that Tidel breached Section 7.9 through a combination of direct and indirect conduct through internal and external communications.[90] Tidel

---

[89] At trial, Landry asserted that such conduct was not impermissible because it was merely educating and informing others that Taylor had validated the R50's $42,500 market price through informal communications with potential customers. Tr. 545 ("It was designed to inform them about the product and the market, etc. It had a suggested average selling price in here of $42,500 . . . ."); Tr. 546 ("This is to give them a flavor of what the market looks like.").

[90] Plaintiffs also alleged that Tidel breached the applicable Non-Solicitation provision in Section 7.9. That provision states, in pertinent part:

> During the Non-Competition Period, neither Buyer [Tidel] not the Company [Sentinel] or their respective Subsidiaries shall, in each case directly or indirectly through another person, . . . (iii) call on, solicit or service any customer, supplier, licensee, licensor, franchisee or other business relation of [Revolution] *in connection with a Revolution Competitive Business*, or in any way interfere with the relationship between any such customer, supplier, licensee or business relationship and [Revolution] (including, without

undertook, directly and indirectly, to assist and advise others, and to both engage in, and propose to engage in, the development, marketing, and manufacturing of the enhanced Series 5 that became the R50 at per unit selling prices above the Inflation Adjusted Price Line. I find unpersuasive Tidel's argument that the R50 cannot be proven to "have a selling price" above the price line because Tidel never actually sold an R50 at any price during the Non-Competition Period.

I conclude that Tidel breached Section 7.9 based on the following facts that were proven at trial by a preponderance of the evidence. For the most part, Smart Safes and recyclers sell in different markets to different customers at price points that diverge widely. After Tidel and Revolution separated, however, the parties identified a market broader than their respective areas of expertise which neither could capture fully without crossing the price line and competing directly with the other. Rather than negotiating to eliminate the price line and compete openly for this middle market, the parties agreed to extend their collaborative relationship by negotiating the Software License Agreement and otherwise leaving the price line dichotomy in place.

---

limitation, inducing such person to cease doing business with [Revolution] or making any negative statements or communications about [Revolution], the Sellers, or any of their respective Affiliates) . . . ."

JX 4 § 7.9(d) (emphasis added). Revolution alleges that Tidel's above-the-price-line price negotiations and marketing efforts with certain of Revolution's customers also breached the Non-Solicitation provision. Tidel disagrees, arguing that both are permitted. I conclude that Revolution's claims with respect to both provisions stand or fall together.

31

In his final months as CEO of Tidel around November 2013, Levenick, who had presided over both Tidel and Revolution and was familiar with the agreements governing their relationship, remained committed to respecting the price line. Others, however, grew impatient with the price line's restrictions and perceived a need to negotiate an increase allowing Tidel to earn higher margins. Beregovsky, Taylor, Galgano, and others exchanged a series of emails in mid-November that reflected Tidel's desire to move towards, or beyond, the price line. On November 14, 2013, Taylor recounted a conversation with Bank of America in which he described plans to launch a solution "mid next year" with gross margins in the low- to mid-30% range and to develop a further version for the end of next year in the 40% gross margin range.[91] Beregovsky responded, asking, "[w]hat's preventing us from getting to higher [gross margins] for such a high value product that's unique in the market? Is that the selling price?"[92] In a later email on the same thread, Beregovsky explained his concerns with the Series 5's gross margins, saying, "[i]f this recycler is truly a unique product with significant potential and if we can't charge a high equipment price because of the non compete, then we need to get much higher margins via recurring services revenue. . . . When we go and sell Tidel, we will obviously tout our high-end product and its growth potential."[93] Tidel further demonstrated its desire to develop and manufacture cash management systems above the

---

[91]     PX 62 at 3.

[92]     *Id.* at 2.

[93]     *Id.* at 1.

price line when it asked Revolution to increase it to $42,500 to "achieve the margins . . . normally expected from a product . . ." both on January 28, 2014[94] and February 14, 2015.[95]

Although Tidel had evidenced a desire to develop and manufacture cash management systems above the price line as early as November 2013, I conclude that the earliest date by which Revolution proved by clear and convincing evidence that Tidel breached the Securities Purchase Agreement was March 10, 2014. On that date, Tidel produced preliminary R50 technical specifications using the Glory Mach 6 and "R50" name for the first time.[96] Even though Tidel continued to use the "Series 5" name for most, if not all, of the rest of 2014, I find that this document manifests a breach of Section 7.9, as it proves Tidel had moved forward with plans to develop a high-end product having a "higher spec" with a selling price above the price line.[97]

Furthermore, because Tidel's Board did not decide to put Tidel up for sale until May 2014, I conclude that its efforts to develop and market the R50 to support such a

---

[94] DX 63.

[95] DX 69.

[96] DX 75. In contrast to Series 5 specifications developed before Tidel fired Levenick, this document evidences Tidel's plan to develop the R50 with a coin recycler capable of processing 25,900 coins at a speed of 3,000 coins per second. *Cf.* DX 47 (determining that the Series 5 would have a capacity of 16,950 coins); Tr. 530 (Landry testifying that he laughed at 240 coins per second processing speed planned for the Series 5).

[97] Accordingly, I also conclude that Tidel breached the non-solicitation provision in Section 7.9(d) when it marketed the Series 5 or R50 to or engaged in pricing negotiations with Revolution's customers above the price line. *See supra* note 90.

sale, including Taylor's "preliminary market research" and the sell-side documents developed by Harris Williams, also breached Section 7.9. As I discussed above, Section 7.9 prohibited Tidel not only from selling cash management systems above the price line, but also from developing or marketing such systems during the Non-Competition Period. In other words, Tidel could not prepare to sell cash management systems above the price line during the Non-Competition Period so that it could begin competing on the first day after its expiration. This, however, is exactly what Tidel did—both directly, beginning in March 2014, and indirectly, beginning in May 2014. Tidel argues that, because it contemplated a stock sale and would be the same "person" both before and after a change of control, Plaintiffs' argument that Tidel's selling efforts were undertaken for another person is wrong. I need not decide that issue, however, because I conclude that Tidel's efforts during 2014 to develop and market the R50 for sale above the price line breached Section 7.9 regardless of whether it did so for itself or another person, such as an investor.[98]

### C. The Implied Covenant of Good Faith and Fair Dealing

Revolution argues, in the alternative, that the implied covenant of good faith and fair dealing disproves Tidel's theory that the R50 did not have, and could not have had, an offending "selling price" in violation of the price line because not a single R50 was

---

[98] Galgano conceded that the business plans and strategy documents prepared as part of the sell-side documents, which indicated a planned average selling price of $42,500 for the Series 5 in 2015, also were created for the commercial purpose of Tidel bringing the Series 5 to market itself. Tr. 762, 765-66, 772.

sold at any price during the Non-Competition Period. According to Revolution, Tidel's theory would permit the "development, marketing or manufacturing" of systems having no price at all during the Non-Competition Period, the "shelv[ing]" of those systems until after the Non-Competition Period expires, and the sale of those systems at prices above the price line. Tidel responds that the implied covenant doctrine "is not a panacea for the disgruntled litigant," and it "cannot be invoked where the contract itself expressly covers the subject at issue, as is the case here."[99] I agree with Tidel's statement of the law, but, as held above, disagree that the contract permitted Tidel's conduct. Tidel also is correct that "[p]arties have a right to enter into good and bad contracts, [and] the law enforces both."[100] In any event, because Revolution prevailed on its claim to enforce Section 7.9 of the Securities Purchase Agreement, I need not reach its claim for breach of the implied covenant of good faith and fair dealing claim based on the same underlying conduct.

**D.     The Software License Agreement "Term" Is At Least Twenty Years**

The parties ask the Court to determine the duration of Tidel's ability to exercise the license grant contained in Section 2.1 (the "Grant Section") of the Software License Agreement by interpreting the word "Term" and the prepositional phrases "during the Term" as used therein,[101] and granting a declaratory judgment reflecting the Court's determination. The Software License Agreement is governed by Texas law. Under

---

[99]     *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008).

[100]     *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).

[101]     JX 8.

35

Texas law, "[t]he primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument."[102] Courts will construe ambiguous contracts as a matter of law.[103] A contract is unambiguous if it "can be given a certain or definite legal meaning or interpretation."[104] "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered."[105] A contract must be construed from a utilitarian standpoint, bearing in mind the particular business activity sought to be served, and avoiding a construction that is unreasonable, inequitable, and oppressive.[106] Once pertinent rules of construction are applied, if the contract can be given definite or certain legal meaning, then it is unambiguous and should be construed by the court as a matter of law.[107]

Tidel argues that the plain language of the Software License Agreement unambiguously grants Tidel a perpetual license. Section 2.1 states that "Revolution hereby grants to Tidel a non-exclusive, perpetual, irrevocable, sublicensable,

---

[102] *Nat'l Union Fire Ins. Co. of Pittsburgh v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995).

[103] *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

[104] *Id.*

[105] *Nat'l Union Fire Ins. Co.*, 907 S.W.2d at 520.

[106] *Frost Nat'l Bank v. L & F Distrib., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (citing *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)).

[107] *Id.*

36

transferrable and fully paid-up license to use, copy, display publically [sic], modify, create derivative works of, sell, and distribute the Licensed Software . . . during the Term."[108] The "perpetual" and "irrevocable" language appears again in Section 2.2, in which Tidel grants Revolution a perpetual and irrevocable cross-license to use any modifications or enhancements Tidel makes to Revolution's software.[109] Section 4.1 implies that "the license grant in the Licensed Software from Revolution to Tidel shall continue on a royalty free basis" for an open-ended amount of time after the twenty-year License Fee Period defined therein.[110] Section 8.1 corroborates the perpetual and irrevocable nature of the license granted by the Software License Agreement, stating that "[n]either party shall have the right to terminate this Agreement for any reason whatsoever, including for breach hereof."[111] Section 8.3 states further that the bankruptcy of either party "shall not be a basis for termination or cancellation of the licenses granted in this Agreement."[112]

The ordinary meaning of the word "Term," however, indicates a limited and finite duration. The Grant Section indicates plainly that Tidel's right to exercise the license grant exists only "during the Term." Even though "Term" is capitalized in that section

---

[108]    JX 8 § 2.1.

[109]    *Id.* § 2.2.

[110]    *Id.* § 4.1.

[111]    *Id.* § 8.1.

[112]    *Id.* § 8.3.

and elsewhere, it is undefined. Texas law presumes that parties intend an undefined term to have its plain, generally accepted meaning.[113] The word "term" means "a fixed period of time,"[114] or "a period of time to which limits have been set."[115] In other words, by its plain meaning, a "Term" cannot be perpetual. Instead, "Term" and "during the Term," used in the context of the software license "grant," create a period of limited duration during which the Software License Agreement would be in effect and enable the grantee to exercise the license.[116] The relevant language of the grant states:

> Subject to the terms and conditions of this [Software License] Agreement, Revolution hereby grants to Tidel a nonexclusive, perpetual, irrevocable, sublicensable, transferrable and fully paid-up license to use, copy, display publically [sic], modify, create derivative works of, sell, and distribute the Licensed Software and Other Licensed Intellectual Property in the Territory during the Term. Such license expressly includes the right to make, have made, use, offer to sell, sell and import Licensed Products that use the Licensed Software and/or Other Licensed Intellectual Property in the Territory during the Term.[117]

---

[113] *Epps v. Fowler*, 351 S.W.3d 862, 866 (Tex. 2011) (citing *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005)).

[114] *Term,* BLACK'S LAW DICTIONARY (10th ed. 2014).

[115] *Term,* DICTIONARY.COM, http://dictionary.reference.com (last visited Oct. 29, 2015).

[116] *See Johnson v. United States*, 559 U.S. 133, 139 (2010) (observing that context determines the meaning of a word with multiple meanings, but that courts do not force term-of-art definitions into contexts where they plainly do not fit) (citing *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)).

[117] JX 8 § 2.1.

Furthermore, the ordinary meaning of "Term" does not specify or inform the temporal limit of duration of "during the Term"; instead, it denotes a limited scope of duration without indicating the actual temporal limit of that duration. Under Texas law:

> The words of a legal instrument are simply indices to external things, and words always need interpretation. It is always necessary to determine their association with external objects, and all circumstances should be considered that go to make clear the sense in which they were used, *i.e.*, *their association with things*.[118]

"Where a question relating to the construction of a contract is presented . . . [courts] are to take the wording of the instrument, considering the same in light of the surrounding circumstances, and apply the pertinent rules of construction thereto and thus settle the meaning of the contract."[119]

In the context of contract construction, evidence of the surrounding events at the time of the parties' agreement is not impermissible parol evidence; rather, it is used to define the meaning of the words the parties chose to document their agreement.[120] Texas law permits all writings that pertain to the same transaction to be considered together, even if they were executed at different times and without express reference to one

---

[118]   *Stewart v. Selder*, 473 S.W.2d 3, 7 (Tex. 1971) (quoting WIGMORE ON EVIDENCE § 2470 (3d ed. 1940)) (emphasis added).

[119]   *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 519 (Tex. 1968).

[120]   *See Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1982).

another.[121]  Accordingly, the duration of the "Term" and the legal effect of "during the Term" in the Grant Section may be construed by reference to the context of the parties' collaborative business relationship, including consideration of all of the 2011 Agreements, as well as the circumstances that led to the Software License Agreement.

The Software License Agreement was part of a series of contracts governing the parties' "continuing collaboration," including the parties' sharing of intellectual property.[122]  The non-competition provisions contained in the Securities Purchase Agreement, however, precluded the parties from servicing unilaterally certain customers who might prefer a full price spectrum of products.  In or around fall 2012, Revolution began actively looking for a solution for those customers who wanted cash management systems with common software interfaces at price-points both above and below the line.[123]  A proposed solution emerged that would enable Tidel to license Revolution's software for systems in which a customer required a common interface, thereby making it easier for Tidel to acquire the "below-the-line" component of a Revolution customer's business, and vice versa for similarly situated Tidel customers who needed "above-the-line" systems.[124]

---

[121]    *DeWitt Cty. Elec. Co-op., Inc. v. Parks*, 1 S.W.3d 96, 102 (Tex. 1999); *Bd. of Ins. Comm'rs v. Great So. Life Ins. Co.*, 239 S.W.2d 803, 809 (Tex. 1951).

[122]    Tr. 526 (Landry); DX 126 ¶ 4 (Landry Aff.).

[123]    *See, e.g.*, Tr. 61, 69, 81 (Levenick); Tr. 524 (Landry).

[124]    *See, e.g.*, Tr. 63-64, 67, 73, 77 (Levenick); Tr. 524 (Landry).

Levenick communicated this solution to one of Revolution's vendors, Fujitsu, to encourage them to work with Tidel to meet the "below the line" needs of Revolution's customers who were "already using Revolution's product (Whole Foods), or are in final evaluations with Revolution (Wal-Mart), but need a smaller less costly unit for a segment of their stores."[125]  On Tidel's behalf, Levenick sought to "make this solution viable . . . [and] to hit a price point in the market . . . ," because Fujitsu note recyclers were "already integrated into the Revolution platform [and] no additional software work would be required for Series 5."[126]  As further evidence of the collaborative purpose of the Software License Agreement, the parties discussed providing Kmart, historically a Revolution customer, with "a common user interface" for Tidel's below-the-line systems that would provide "benefits in training [and] staff movement between stores . . . ."[127]

Revolution argues that, in light of Texas contract law principles and considering the Software License Agreement's context and the particular collaborative business purposes it was designed to achieve, the word "Term" means a finite timeframe connected with, and dependent upon, the parties' contract-based manufacturing relationship.  Therefore, Revolution argues, when the term of the Manufacturing

---

[125]  DX 54.

[126]  *Id.* ¶ 2; Tr. 80-83 (Levenick).  The evidence suggests that the Fujitsu note recyclers used in Revolution's product were higher performance and higher priced components than what Tidel contemplated using for the Series 5.  Levenick apparently was encouraging Fujitsu to lower its price to achieve a higher sales volume.

[127]  PX 48.

Agreement ended on February 15, 2015, and the price line restrictions of the Non-Competition Period also ended, there no longer was any reason for the license grant to continue. By extension, then, Revolution posits that "during the Term" limits the duration of Tidel's rights to exercise a license to Revolution's software to a period that coincides with the termination of the Manufacturing Agreement.

In response, Tidel argues that Revolution's interpretation of the Software License Agreement should be rejected as unreasonable. I agree. "An ambiguity arises only after the application of established rules of construction leaves an agreement susceptible to more than one meaning. Further, for an ambiguity to exist, both potential meanings must be reasonable."[128] There is no reasonable reading of the Software License Agreement that would incorporate by reference the meaning of the word "term" as used in the Manufacturing Agreement. The parties executed the Manufacturing Agreement more than a year earlier; it bears no relation to the cross-licensing of intellectual property; and the Software License Agreement makes no reference to it. Revolution fails to offer any explanation for why the "Term" in the Software License Agreement should correspond with the (undefined) "term" as used in the Manufacturing Agreement and not the defined "Term" of the Cross License Agreement, which the parties also executed in November 2011. Further, Revolution provides no reasonable explanation for linking the "Term" of an agreement that is expressly non-terminable by either party with the term of an

---

[128]     *DeWitt Cty. Elec. Co-op.*, 1 S.W.3d at 100.

agreement that was terminable by Tidel on one year's notice. To do so would render meaningless the "non-terminable" provisions of the Software License Agreement.

In addition, I reject the way in which Revolution has sought to rely on parol evidence to give context to the Software License Agreement.[129] Extrinsic evidence is inadmissible to "contradict or vary the meaning of the explicit language of the parties' written agreement."[130] Revolution's argument relies in part on Levenick's subjective intent with respect to the "Term" of the Software License Agreement. Specifically, Levenick testified that Revolution's board would not have agreed to authorize Tidel to exercise for an unlimited duration the license grant to its software, considering the potentially limited term of the parties' collaborative relationship and the restrictive covenants.[131] According to Levenick, this is why "during the Term" was included in the language of the Grant Section.[132] That is, at the end of the Term, each party would have the independent ability (unrestricted by any price line covenant) to develop, market, and manufacture cash management systems both above and below the price line for a customer needing the same and each party could provide that customer a common user interface for systems developed along the full price spectrum, using its own software.[133]

---

[129]  *See Nat'l Union Fire Ins. Co.*, 907 S.W.2d at 520.

[130]  *Id.* at 521.

[131]  Tr. 78.

[132]  Tr. 77.

[133]  DX 133 ¶ 125 (acknowledging that Tidel has its own software and user interface for its products).

Even if Levenick believed the agreement was to operate the way he explained, however, case law and contract law are clear that the subjective intent of a party is not controlling. What matters is what a reasonable person reading the contract objectively would think it means. Revolution attempts to skirt the parol evidence rule by couching its proffered evidence of Levenick's intent as indicia of the "circumstances" surrounding the execution of the Software License Agreement, which Revolution argues is "not impermissible parol evidence" under Texas law. But, the Court in *Sun Oil* stated that "circumstances" excluded "oral statements by the parties of what they intended [the contract] to mean."[134] Thus, to the extent Revolution's evidence of the "circumstances" consists of Levenick's testimony about what he intended, that constitutes impermissible, subjective, parol evidence. Finally, the Software License Agreement contains a merger clause that precludes the admission of Revolution's proffered evidence.[135] Where a contract contains a merger clause, "it will be enforced as written and cannot be added to, varied, or contradicted by parol evidence."[136]

By contrast, Tidel argues strenuously that, because the Software License Agreement is itself perpetual, it therefore grants to Tidel a perpetual license to create Licensed Units. Revolution disagrees, arguing that such a construction defies plain

---

[134] *Sun Oil*, 626 S.W.2d at 731 n.5.

[135] JX 8 § 10.11.

[136] *ISG State Operations, Inc. v. Nat'l Heritage Ins. Co.*, 234 S.W.3d 711, 719 (Tex. App. 2007).

language and dishonors basic contract principles. Under the Grant Section, Licensed Units sold by Tidel during the Term would be licensed in perpetuity. Tidel's contention that the duration of the "Term" is perpetual and the phrase "during the Term" means "in perpetuity," however, defies both the common meaning and the common usage of the word "term" in the context of the Grant Section. Tidel would have "Term," *i.e.*, a word meaning a limit of duration, mean the same as "perpetual," *i.e.*, a word indicating limitless duration. Tidel's construction would negate the very existence of the prepositional phrase, "during the Term"—used four separate times—in the Grant Sections of the Software License Agreement. Tidel's construction also would render superfluous the words "Term" and phrases "during the Term" and "for the Term" as used throughout the agreement in Sections 2.1, 2.2, 6.1, and 10.3.

Tidel also insists that the Software License Agreement is itself perpetual and, therefore, grants to Tidel a perpetual license to create Licensed Units. This argument overlooks the legal distinction between a perpetual license and a perpetual agreement. An agreement granting a perpetual and irrevocable license of intellectual property rights in software is distinguishable from the scope and duration of an agreement which provides a grant of rights to exercise such a license.[137] Furthermore, Texas law disfavors perpetual agreements. As a matter of Texas law, which is in accord with Delaware law,

---

[137]  *See Vance v. Casebolt*, 841 P.2d 394, 400 (Colo. Ct. App. 1992) (noting distinction between the term of a license and the term of the license agreement itself).

if the Court determines that the "Term" of the Software License Agreement itself was drafted to be perpetual, then the agreement is terminable at will by either of the parties.[138]

Moreover, the agreement cannot be read in harmony, as a whole, if Tidel's argument is accepted. For example, Section 9.1 contemplates expressly that the parties' obligations may be "terminated by the termination or expiration of this Agreement . . .," and Section 10.3 indicates that certain confidentiality obligations of the parties continue by agreement only, "for the Term and for a period of seven (7) years thereafter . . . ."[139] Accordingly, Tidel's argument would render the language of Sections 9.1 and 10.3 meaningless or superfluous. Texas law does not permit a court to adopt such an interpretation of a contract.[140] Sections 2.1, 2.2, 6.1, 8.1, 9.1, and 10.3, independently and collectively, are harmonious and effective only if the Software License Agreement is not a contract of perpetual duration.

Texas law construes the words of a legal instrument based on "their association with things."[141] To my mind, the word "Term" in the context of the Software License Agreement more likely than not operates as an analog to the "Term" defined in the Cross-

---

[138]     *See Delta Servs. & Equip., Inc. v. Ryko Mfg. Co.*, 908 F.2d 7, 9-10 (5th Cir. 1990); *Clear Lake City Water Auth. v. Clear Lake Util. Co.*, 549 S.W.2d 385, 390 (Tex. 1977); *SHA, LLC v. Nw. Tex. Healthcare Sys., Inc.*, 2014 WL 31420, at *3 (Tex. App. Jan. 3, 2014); *accord Silver Lake Office Plaza, LLC v. Lanard & Axilbund, Inc.*, 2014 WL 5953778, at *8 (Del. Super. Jan. 17, 2014).

[139]     JX 8.

[140]     *See Coker*, 650 S.W.2d at 393.

[141]     *Stewart*, 473 S.W.2d at 7 (quoting WIGMORE ON EVIDENCE § 2470 (3d ed. 1940)).

License Agreement that relates to patents and related proprietary rights.[142] There, "Term" means the period of time on a country-by-country basis from the Effective Date until there are no longer any Valid Claims under any of the Licensed Patents.[143] Although the Software License Agreement concerns Licensed Software and not Licensed Patents, I interpret the Term of the Software License Agreement similarly to derive its meaning from the parties' rights to use the Licensed Software for the life of the intellectual property subject to the license.[144] In other words, I interpret the word "Term" and phrase "during the Term" based on their association with external objects, namely the intellectual property rights underlying the Licensed Software.

Because the record on this issue is not well-developed, I take judicial notice of Federal copyright law to ascertain evidence of what the law considers the reasonable duration of copyrights, such as those underlying the Licensed Software at issue here. According to 17 U.S.C. § 302(a), "[c]opyright in a work created on or after January 1, 1978, subsists from its creation and, except as provided by the following subsections,

---

[142] JX 6 (recitals explaining that Tidel and Revolution each desire to license their respective patents and other proprietary rights to the other).

[143] JX 6 § 1. In addition, "Valid Claim" is defined to mean a claim in any unexpired and issued Licensed Patent that has not been disclaimed, denied, or admitted to be invalid or unenforceable or revoked or held invalid or unenforceable by a final unappealable decision of a court of competent jurisdiction or government agency and that would be infringed in the applicable country by the using, making, having made, offering for sale, selling, or importing of such Licensed Product, but for the license granted to the other Party under this Agreement. *Id.*

[144] "Where the duration of a contract is not expressly prescribed, a reasonable time will be inferred." *Beago*, 619 S.W.2d at 295.

47

endures for a term consisting of the life of the author and 70 years after the author's death."[145] I need not determine more definitely the duration of the copyrights underlying the Licensed Software, nor do I need to determine the duration of the "Term" to an exact number of years. Rather, I conclude that the duration of the "Term" at issue in the Software License Agreement is more likely than not tied to the life of the intellectual property rights associated with the Licensed Software.

Because the "Term" of the Software License Agreement is not defined and that appears to be the product of inartful drafting, the Term of the agreement could be considered ambiguous. That is, one reasonably could argue that the Term is a relatively short period, as Revolution does, while another reasonably could argue that a relatively long Term was intended, as Tidel does in contending the Term is either "perpetual" or at least twenty years. To the extent the Term of the Software License Agreement is ambiguous, I can consider any relevant extrinsic evidence in determining its meaning.[146] Having reviewed the extrinsic evidence in this case, I conclude that it supports a finding that the parties intended to grant, to the extent possible, a perpetual, irrevocable license for Tidel to use Revolution's software. Every person involved with drafting the Software License Agreement agreed that the software license was intended to be perpetual,

---

[145]    17 U.S.C. § 302(a).

[146]    *Nat'l Union Fire Ins. Co.*, 907 S.W.2d at 520 ("If, however, the language of a policy or contract is subject to two or more reasonable interpretations, it is ambiguous. . . . Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretations . . . and admit extraneous evidence to determine the true meaning of the instrument." (internal citations omitted)).

irrevocable, and non-terminable—except Levenick. As the CEO of both Tidel and Revolution, Levenick "dictated the terms under which [the agreement] would be constructed" to Taylor (Tidel's Executive Vice President of Global Business Development), Galgano (CFO of both Tidel and Revolution), and Hudson (Revolution's General Manager).[147] Galgano and Taylor testified that the instructions they received from Levenick were clear: to create a perpetual license for Tidel to use Revolution's software that could never be terminated.[148] The attorneys who drafted the contract confirmed to Galgano that the "[software] license is already perpetual and irrevocable and the agreement cannot be terminated for any reason, even for breach."[149] Levenick himself agreed with these terms in March 2013.[150] Landry and Beregovsky confirmed that Levenick reported to the board in March 2013 that he had secured a perpetual license for Tidel to use Revolution's software.[151]

Levenick is the only person who contends otherwise, yet his *ex post* explanation of why the "Term" of the Software License Agreement is coextensive with the Manufacturing Agreement is not credible. The Manufacturing Agreement was scheduled

---

[147] Tr. 155 (Levenick).

[148] Tr. 730 (Galgano); Tr. 897 (Taylor).

[149] DX 33, 35; DX 36 (Galgano instructing the attorneys, "[w]e would like to add language that basically says that nothing can really break this. . . . And so long as Tidel pays the $250/unit . . . Tidel always has its right to use the license.").

[150] DX 37 (Levenick replying to the exchange, "Yes.").

[151] Tr. 421 (Landry); Tr. 705 (Beregovsky).

to end by its terms on November 2, 2016 at the latest, and did not contain any provision that contemplated an extension or renewal. Thus, the Software License Agreement would have ended automatically on November 2, 2016, with no chance of renewal. That is not what Levenick told the board or anybody else. Indeed, Beregovsky testified that he never would have approved the R50 without Levenick's assurances that the Software License Agreement was perpetual.[152] Accordingly, even assuming it is relevant, I do not consider reliable Levenick's testimony that, as a 20-year veteran CEO of a successful cash management system company, he sought and obtained board approval to invest heavily in a new product with an untested market relying on software that Tidel would lose the rights to use in as early as three years.

In Texas, contracts without a definite term of duration remain enforceable.[153] "When the duration of a contract is not expressly prescribed, a reasonable time will be inferred."[154] Tidel argues that, if the Court determines that the term of the Software License Agreement is not perpetual, then the license granted by Revolution to Tidel should extend for not less than twenty years from the date the Software License Agreement was executed. This twenty year period corresponds to the length of time during which Tidel must pay Revolution a one-time license fee of $250 for every unit

---

[152]    Tr. 706.

[153]    *O'Farrill Avila v. Gonzalez*, 974 S.W.2d 237, 244-45 (Tex. App. 1998).

[154]    *Marshall v. Marshall*, 735 S.W.2d 587, 592 (Tex. App. 1987); *Beago v. Ceres*, 619 S.W.2d 293, 295 (Tex. App. 1981).

sold within that period that uses Revolution's software.[155] "When it appears . . . that an agreement is necessarily limited as to duration by the happening of any one of several contingencies, this ascertainable contingency determines the duration" of a contract without an express term.[156] The Software License Agreement contains an ascertainable contingency or event: the expiration of the twenty-year License Fee Period. Tidel argues that that contingency should set the term of the agreement absent an enforceable "perpetual" term.

I do not agree entirely with Tidel's argument, but conclude that, because no evidence was presented on the duration of the "Term" in years other than approximately two years, twenty years, or in perpetuity, it is reasonable to infer that the "Term" here extends for at least twenty years.[157] In this respect, I have not relied on Tidel's argument that the License Fee Period—as an "ascertainable contingency"—alone determines the

---

[155]  *See* JX 8 § 4.1.

[156]  *Marshall*, 735 S.W.2d at 592.

[157]  I also consider unpersuasive Revolution's argument that construing the Term and the License Fee Period to have the same meaning would render one or the other of those separately defined terms meaningless or redundant because I do not accord those two terms the same meaning. Nor do I reach Revolution's argument that Texas law does not permit perpetual agreements; I have not construed the Software License Agreement to be perpetual.

For the reasons stated in this section and section II.G *infra*, I reject wholesale Revolution's request for a permanent injunction prohibiting Tidel from any further use of Revolution's software and ordering the return of all source code and software documentation in Tidel's possession, custody or control, as well as the removal of the software from any Tidel unit into which it has been installed and the recall of any units using Revolution's software that have been deployed to or piloted with third parties.

51

duration of the "Term" in concluding that a Term exceeding twenty years is appropriate. Instead, I conclude that the "Term" extends for the life of the intellectual property underlying the Licensed Software and draw an inference from the relatively lengthy terms of copyrights, of which I take judicial notice, and the twenty-year License Fee Period specified in the agreement that, in this instance, the "Term" lasts for at least twenty years.

Revolution protests that a construction of the Software License Agreement requiring Revolution to honor the one-time, per unit License Fee at the "family business member price" of $250, even after the familial relationship was destroyed and devolved into direct business competition, would be oppressive at its core. I disagree. Revolution agreed to that license fee in the Software License Agreement.[158] Furthermore, the evidence shows that Levenick viewed Tidel and Revolution's family relationship through rose-colored glasses. The twenty year $250 per unit License Fee Period supports my view that Levenick more likely than not envisioned the parties' collaboration continuing indefinitely. That is what the parties bargained for and is effectively what the parties obtained—even when it cuts both ways. For example, Tidel has convinced this Court that the Software License Agreement grants a license that cannot be terminated and extends for a Term of at least twenty years. Yet, Section 2.2 of the same agreement creates an arguably iron-clad cross-license that requires Tidel to share any modifications

---

[158]    JX 8 § 4.1.

52

it makes to the Licensed Software with Revolution during the same Term.  The parties also must live with that provision.

### E.  Tidel Misused Revolution's Confidential Information

The Manufacturing Agreement, Services Agreement, and Cross License Agreement each contained confidentiality provisions obligating Tidel not to use Revolution's confidential information other than for purposes of fulfilling contractual obligations to Revolution.[159]  The Manufacturing Agreement defines Confidential Information to include, among other things:

> As used herein, "Confidential Information" means . . . any and all technical or business or financial information, . . . in whatever form or medium (regardless of whether tangible, intangible, visual or oral), . . . trade secrets, works of authorship, software programs, software source documents, software architecture, algorithms, formulae, ideas, techniques, know-how, processes, inventions, apparatuses, equipment, models, information related to current, future and proposed products and services, research, experimental work, development, design details, specifications and engineering information, procurement, purchasing and manufacturing requirements, costs, pricing . . . and any physical manifestations of Confidential Information (such as notes, reports, memoranda, etc.).[160]

---

[159]  JX 4 § 9(f) (Each party agrees to "use the other party's Confidential Information only as necessary to perform its obligations and exercise its rights under this [Manufacturing] Agreement . . . ."); JX 5 § 6 (Each party agrees to "use the other party's confidential or proprietary information only as necessary to perform its obligations and exercise its rights under this [Administrative Services] Agreement . . . ."); JX 6 § 9.3 (Each party agrees that it "will not use any Confidential Information except for the limited purposes set forth in this [Cross License] Agreement . . . .").

[160]  JX 4 § 9(e).

In addition, the Cross License Agreement defines, with some exceptions, Confidential Information as "all information and data, regardless of form, including a formula, pattern, compilation, program, method, technique, process, material, physical or chemical structure or activity, design, [or] source code . . . proprietary to the disclosing Party or its Affiliates . . . ."[161]

Revolution complains that Tidel impermissibly has used Confidential Information in developing two aspects of the R50: (1) its parts; and (2) its software. Moreland admitted that Tidel used Revolution's Confidential Information, including its Solidworks files, to develop the R50 and several of its parts, including the top cover, the coin return bin, various mounting brackets, and the door stop.[162] I held above that Tidel's development of the R50 breached Section 7.9 of the Securities Purchase Agreement. In addition, it is clear that Tidel's development of the R50 was not in the performance of its obligations or exercise of its rights under the Manufacturing, Services, or Cross License Agreements. Accordingly, I conclude that Tidel misused Revolution's Confidential Information in breach of these agreements.

Tidel argues that it reserved its right to use the top cover and door stop models under the September 2014 release, as evidenced by the fact that they were stamped with a

---

[161] JX 6 § 1.

[162] Tr. 673-78.

Tidel Engineering legend.[163] I disagree. Section 1 of that release stated that "Tidel and [Revolution] hereby agree that Documents created prior to November 2, 2011 are "Other Intellectual Property" within the meaning of the Cross License Agreement and each party's rights with respect to such Documents are covered by the Cross License Agreement."[164] In Section 2 of the release, Tidel released Revolution of liability with respect to, and granted to, Revolution the right to use and license certain additional engineering documents and drawings created pursuant to the November 2, 2011 Manufacturing Agreement, but clarified that such release and right to use was not a trademark license with respect to any Tidel trademarks incorporated in or appearing on documents or drawings created before or after the parties entered into the Manufacturing Agreement. Because the documents and drawings that form the basis for Revolution's claims in this action were created before November 2, 2011,[165] the plain language of the September 2014 release dictates that they are "Other Intellectual Property" within the meaning of the Cross License Agreement, which agreement also specifies the rights of the parties with respect to those part designs. In particular, Tidel had undertaken that it would not use Revolution's "Other Intellectual Property" except in the performance of its obligations or exercise of its rights under the Cross License Agreement, as well as the

---

[163]    DX 100 § 1 (and first WHEREAS).

[164]    *Id.* § 1.

[165]    DX 144 at 6 (top cover file created March 5, 2008), 8 (coin return bin files created August 17, 2011), 10-11 (mount bracket files created July 30, 2007 and March 5, 2008), 12 (door stop file created June 23, 2010).

Manufacturing and Services Agreements. Therefore, Tidel's use of the parts models in developing the R50 with a selling price above the price line breached the confidentiality provisions and use limitations in those agreements, and the September 2014 release provided no safe harbor in that regard.

Tidel contends that the door stop is not at issue because Tidel replaced that part with one of a different design for the production version of the R50.[166] Nonetheless, Moreland admitted to using the door stop model in the R50 prototype designs,[167] which, as discussed below, would be in violation of Revolution's contract rights.

Finally, Tidel avers that Revolution presented no evidence that Tidel benefited in any way from the use of the four models. But, Tidel's own expert, Paul Terpstra, quantified the amount of time (eight to twelve hours) and the value of his time ($80 to $90 per hour) that it would have taken for him to create the Tidel parts from scratch as opposed to using Revolution's confidential drawings. This translates into a range of damages from $640 to $1,080.[168] Terpstra admitted that he also would need models of the pieces with which those parts interface,[169] and Tidel admits that its engineers had

---

[166]    Defs.' Answering Br. 46; *see also* Tr. 1011 (Terpstra) (Tidel's expert testifying that "[t]here are no features in common between the [Tidel and Revolution doorstop] models").

[167]    Tr. 647 ("The door stop is the part that we use[d] for the prototypes but we're not using [it] in our production equipment.").

[168]    Tr. 1046.

[169]    Tr. 1041.

56

access to all of Revolution's drawings in the development of the R50.[170] These admissions support a reasonable inference that Tidel used Revolution's confidential information not only for specific parts, but also for the full benefit of all the Revolution drawings that they needed for interfacing pieces. I conclude, therefore, that Revolution proved that Tidel breached the confidentiality provision in the Manufacturing Agreement and that it is entitled to damages and a permanent injunction based on this breach, as discussed in greater detail *infra*.

Next, Revolution argues that its software is also confidential information and seeks $2 million in damages arising from Tidel's alleged misuse of that software in connection with its development of the R50. Having construed both the Software License and the Securities Purchase Agreements above, I reject Revolution's argument that Tidel breached the applicable confidentiality provisions by installing the Licensed Software into R50 systems for the following reasons. First, whether the software at issue was "Confidential Information" under the Manufacturing, Services, or Cross License Agreements is irrelevant, because the Software License Agreement expressly governs Tidel's right to use the Licensed Software and in that respect superseded those prior agreements. Second, the Software License Agreement does not limit Tidel's use of the Licensed Software; in fact, the Grant Section allows Tidel "to use, copy, display publically [sic], modify, create derivative works of, sell, and distribute the Licensed

---

[170]    Tr. 807 (Powers).

Software and Other Licensed Intellectual Property in the Territory during the Term."[171] I held above that the "Term" did not expire with the Manufacturing Agreement, but has a duration of at least twenty years from the inception of the Software License Agreement on March 29, 2013. Therefore, Tidel had the right to use the Licensed Software. Finally, because the parties intended the Inflation Adjusted Price Line to terminate with the Manufacturing Agreement and that agreement in fact terminated on February 15, 2015, and the parties agreed in the Software License Agreement that the License Fee Period would be twenty years, I conclude that the parties intended the $250/unit "brother-in-law" License Fee to continue after their collaborative business relationship terminated. Therefore, I reject Revolution's contention that they are entitled to $2 million in damages based on Tidel's alleged misuse of the Revolution software.[172]

---

[171]  JX 8 § 2.1.

[172]  I also find that Revolution failed to prove any misuse of the software because Revolution failed to prove that an enforceable contract prevented Tidel from using the software in an R50 developed for sale above the price line. Absent the Software License Agreement, Tidel could not have used the software beyond what was necessary to fulfill its obligations to Revolution under Section 9(f) of the Manufacturing Agreement. But the Software License Agreement granted Tidel the right to use the software outside its performance of its obligations under the Manufacturing Agreement. Revolution has not satisfied its burden of proving otherwise. In fact, the evidence supports a finding that use of the Revolution software in a Tidel Series 5 or R50 system would not mean, in and of itself, that the system was being developed to have a selling price above the Inflation Adjusted Price Line.

### F.      Revolution is Entitled to Relief for Tidel's Breaches

### 1.      Tidel's breach of the Securities Purchase Agreement

### a.      Permanent injunction

Revolution proved entitlement to a permanent injunction of limited duration for Tidel's breach of the Securities Purchase Agreement. To obtain a permanent injunction, Revolution must show: (1) actual success on the merits; (2) irreparable harm; and (3) a balance of the equities favoring such relief.[173] To show that it is entitled to specific performance of a covenant not to compete, Revolution must prove the same elements by clear and convincing evidence.[174] For the following reasons, I conclude Revolution has met these burdens.

Revolution proved a breach of Section 7.9 by Tidel's development of the R50 with a "new [gross margin] if we go to Mach 6 with new pricing."[175] Revolution proved that the breach commenced on March 10, 2014—promptly after Tidel terminated the Manufacturing Agreement. By July 2014, Landry and Taylor openly had communicated Tidel's new philosophy of a "higher price for a higher spec" regarding the development of the R50.[176] Taylor brazenly called upon two of Revolution's own customers

---

[173]  *Kan-Di-Ki*, 2015 WL 4503210, at *25; *Concord v. Wilm. Steel Processing Co.*, 2009 WL 3161643, at *10-11 (Del. Ch. Sept. 30, 2009).

[174]  *Kan-Di-Ki*, 2015 WL 4503210, at *25.

[175]  DX 90. The Mach 6 is a higher performance component than what Levenick had proposed for the Series 5 or R50 before his termination.

[176]  DX 90; PX 106-107.

concerning the new specification and increased price to "$42.5k (ish)." And Galgano reiterated the "new pricing" plan days later: "We need to change Series 5 price to $42500 . . . ."[177] By August 2014, internal Tidel documents were approved by the Board, declaring that "[t]he Series 5 [R50] will be priced at an [average selling price] of $42.5k . . . ."[178] Therefore, I conclude that Revolution has shown by clear and convincing evidence that Tidel developed and marketed the Series 5—later renamed the R50—with a selling price above the Inflation Adjusted Price Line at least as early as March 10, 2014.

As to irreparable harm, this Court may rely upon enforceable contractual affirmations of the existence of such harm.[179] Here, the Securities Purchase Agreement provides that "[e]ach Party recognizes and affirms that in the event of breach by it of any of the provisions of this Section 7.9, money damages would be inadequate and the other Parties would have no adequate remedy at law."[180] The parties' arm's length agreement concerning the inadequacy of a legal remedy satisfies the irreparable harm requirement for injunctive relief,[181] and the trial record reflecting the nature and extent of Tidel's breaches further supports such a finding.

---

[177] JX 17.

[178] Tr. 769 (Galgano).

[179] *See Kan-Di-Ki*, 2015 WL 4503210, at *26.

[180] JX 3 § 7.9(h).

[181] *Hough Assocs., Inc.*, 2007 WL 148751, at *18.

Balancing the equities also favors issuance of injunctive relief similar in scope and duration to that sought by Revolution. Plaintiff is entitled to the full and fair benefit of its bargain, *i.e.*, fair competition resulting from a clean start. Revolution proved that Tidel jumped the starting gun by impermissibly developing and marketing an R50 having a higher specification and suitable for sale above the price line months before the Non-Competition Period ended on February 15, 2015. Tidel, therefore, "is in a particularly poor position to object that . . . [it] will suffer restraint greater than that to which [it] agreed."[182] In other words, balancing the equities requires returning Tidel to the starting line to remedy its calculated false start, so that Revolution receives the contractual protection for which it bargained.[183]

Here, I look to Section 7.9 itself as "the most appropriate caliper for measuring and defining an appropriate remedy, including its duration."[184] The parties agreed to remedy a proven violation by "extension of the Non-Competition Period . . . equal to (i) the length of the violation of this Section 7.9 plus (ii) the length of any court proceedings

---

[182]     *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Price*, 1989 WL 108412, at *5 (Del. Ch. Sept. 13, 1989).

[183]     *Wal-Mart Stores, Inc. v. Mullany*, C.A. No. 6050-VCL, at *78 (Del. Ch. Dec. 15, 2010) (TRANSCRIPT) (observing that balance of the equities would favor enforcement of non-competition agreement where one party took a "calculated risk" that the other would not seek to enforce its right).

[184]     *All Pro Maids, Inc. v. Layton*, 2004 WL 1878784, at *12 (Del. Ch. Aug. 9, 2004); *Tristate Courier & Carriage, Inc. v. Berryman*, 2004 WL 835886, at *14 (Del. Ch. Apr. 15, 2004).

necessary to stop such violation."[185]  Therefore, Section 7.9(h) provides a basis for granting an injunction with duration equal to the number of days between March 10, 2014 and the date of the issuance of an injunction in this litigation.  An appropriate injunction is being entered concurrently with this Memorandum Opinion on October 30, 2015.  Therefore, the length of the injunction will be for 599 days, *i.e.*, approximately twenty months.

Revolution seeks an injunction enforcing the terms of Section 7.9(c), and then some—*i.e.*, Revolution requests that I enjoin Tidel from:

> . . . anywhere in the world, directly or indirectly, either for itself or for any other Person, owning, operating, managing, controlling, engaging in, participating in, investing in, permitting its name to be used by, acting as consultant or advisor to, rendering services for (alone or in association with any Person) or otherwise assisting in any manner, any Person that engages in or owns, invests in, operates, manages or controls any venture or enterprise which directly or indirectly engages or proposes to engage in the business of developing, marketing, or manufacturing the R50 cash management system or any alternative configuration of the R50 under any name.[186]

Revolution argues that an injunction permitting Tidel to continue selling the R50, as long as it does so below the price line, would be inequitable.  I agree, but only to the extent the R50 meets the higher specification Tidel effectively adopted on or about March 10, 2014 or otherwise is developed for higher performance than the Series 5 as it

---

[185]    JX 3 § 7.9(h).

[186]    Pl.'s Reply Br. 24.

existed in December 2013. As discussed above, the plain language of Section 7.9(c) prohibits not only selling cash management systems above the price line, but even *developing* such systems. The right determines the remedy. Here, I consider the appropriate remedy to be an injunction remedying Tidel's breach of Section 7.9, which I concluded stemmed from its developing and marketing of a higher performance cash management system with a selling price above the Inflation Adjusted Price Line. That is, had Tidel complied with the bargained-for restriction, the R50 in its latest iterations would not exist. Therefore, I conclude that Revolution is entitled to an injunction similar to the one it seeks. I find, however, that, in at least one respect, Revolution's proposed injunction is too broad.

That aspect relates to the specifications for the R50. Before March 2014, Tidel had expended substantial time and resources developing a Series 5 machine, which it later referred to as the R50, with a lesser specification. As noted in Revolution's Reply Brief, by December 2013, Levenick and Moreland had developed the Series 5 to have a selling price below the price line using a coin recycler that could process up to 16,950 coins at a speed of 240 coins per second.[187] Then, first in January and again in February 2014, Tidel sought Revolution's consent to use Revolution's coin sorter intellectual property in support of its development of a more advanced product and to increase the price line to enable it to do so. The March 10 document is the next manifestation of Tidel's impermissible plans to develop a product with a selling price above the price line.

---

[187]    Pl.'s Reply Br. 4.

63

Accordingly, Revolution is entitled to an injunction restricting Tidel's marketing or sale of any cash management system utilizing a note recycler and a coin recycler together with technical specifications materially more advanced than the December 2013 Series 5—which I conclude was the last "version" of the R50 permitted by the Securities Purchase Agreement.[188] The injunction will not preclude Tidel from using the software subject to the Software License Agreement.

### b. Damages

Revolution, however, is not entitled to the monetary damages it seeks for Tidel's breaches of the Securities Purchase Agreement. To prove damages, Revolution "must show both the existence of damages provable to a reasonable certainty, and that these damages flowed from the defendants' violation of the contract."[189] Revolution alleged two bases for monetary relief: a lost profits theory and an unjust enrichment theory. Both fail for the following reasons.

Revolution alleged that it is entitled to monetary damages of at least $89,487, or the expected profit on nine R50 units. Revolution's argument lacks a factual or legal basis. As a factual matter, Revolution does not explain why it is entitled to lost profits relating to nine R50 machines and the record is devoid of evidence that Revolution lost

---

[188]    For the avoidance of doubt, this relief does not impinge from Tidel's rights with respect to subsections (x) and (y) of Section 7.9(c) to develop products with a note recycler but not a coin recycler, or a coin recycler without a note recycler, consistent with the terms therein.

[189]    *LaPoint v. AmerisourceBergen Corp.*, 2007 WL 2565709, at *9 (Del. Ch. Sept. 4, 2007).

any sales, much less nine units. As a legal matter, "[c]ontract damages . . . should not act as a windfall."[190] Here, there has been no showing that Revolution's alleged lost profits are likely to equal Tidel's profits on the nine R50's. The proper measure of Revolution's damages, if any, would be the sales that Revolution purportedly lost as a result of Tidel's breaches of the Securities Purchase Agreement—about which no evidence was produced at trial. In fact, Brian McCabe of G4S testified that the opposite was true: even while testing the R50, G4S pursued aggressively the adoption of Revolution's products in the marketplace, including Series 7000 and Series 8000 recyclers.[191]

Revolution's lost profits theory also fails because it is inherently speculative.[192] Delaware courts have held that "measuring money damages for an unproven technology" is a "nearly impossible task" because "such damages are likely to be merely speculative."[193] Here, Revolution's expert's damages model assumed that Revolution was entitled to damages because the R50 would replace the Revolution 7000 on a one-to-one basis, but the expert admitted he had no way to confirm that.[194] Nor did he offer an opinion as to whether Revolution even would make these projected sales as opposed to

---

[190]    *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009).

[191]    McCabe Dep. 19-20.

[192]    *See Fletcher Int'l, Ltd. v. Ion Geophysical Corp.*, 2013 WL 6327997, at *17 (Del. Ch. Dec. 4, 2013).

[193]    *Amaysing Techs. Corp. v. Cyberair Commc'ns, Inc.*, 2004 WL 1192602, at *5 (Del. Ch. May 28, 2004).

[194]    Tr. 357 (Bell).

some competitor other than Tidel.[195]  Revolution has identified no sales, customers, or goodwill that it lost as a result of Tidel's breaches or any reasonable basis for inferring that it would have suffered any such losses.  Therefore, Revolution has failed to prove that it has lost or will lose a single sale of the Revolution 7000 to the R50.

Revolution's unjust enrichment theory fares no better because it is precluded by Revolution's own allegation that Tidel breached the Securities Purchase Agreement.  A "claim for unjust enrichment is not available if there is a contract that governs the relationship between the parties that gives rise to the unjust enrichment claim."[196]  "When the complaint alleges an express, enforceable contract that controls the parties' relationship . . . a claim for unjust enrichment will be dismissed."[197]  I therefore deny Revolution's request for damages arising out of Tidel's breach of the Securities Purchase Agreement.

### 2.    Tidel's misuse of Revolution's Confidential Information

Revolution proved that it is entitled to damages arising from Tidel's breach of the Manufacturing, Services, and Cross License Agreements.  In awarding Revolution damages on its misuse of confidential information claim, however, I am mindful that the amount of time Tidel saved by misusing Revolution's drawing, rather than the total amount of time it would have taken Tidel to create the parts from scratch, is a more

---

[195]    Tr. 374.

[196]    *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009).

[197]    *Id.* (internal citation omitted).

appropriate measure of damages. Accordingly, I award Revolution only $640, which is the low end of the range provided by Terpstra.

Revolution also proved entitlement to a permanent injunction preventing Tidel from using Revolution's Confidential Information that remains in Tidel's possession and requiring Tidel to return promptly "all copies" of Revolution's Solidworks models, drawings, or documents. As set forth above, to prove entitlement to a permanent injunction, Revolution must show: (1) actual success on the merits; (2) irreparable harm; and (3) a balance of the equities favoring such relief.[198] Revolution proved Tidel breached several confidentiality provisions by clear and convincing evidence. Further, this Court has long recognized that the impermissible use of proprietary and confidential information constitutes irreparable harm.[199] Finally, Tidel argues that injunctive relief is unwarranted, but provides no basis for balancing the equities in its favor. Therefore, I conclude Revolution is entitled to a permanent injunction enjoining Tidel from breaching the confidentiality provisions of the Manufacturing, Services, and Cross License Agreements and requiring Tidel promptly to return Revolution's confidential information.

---

[198] *Kan-Di-Ki*, 2015 WL 4503210, at *25; *Concord*, 2009 WL 3161643, at *10-11; *Webb v. Glenbrook Owners Ass'n, Inc.*, 298 S.W.3d 374, 384 (Tex. App. 2009).

[199] *See, e.g.*, *Am. Totalisator Co. v. Autotote Ltd.*, 1983 WL 21374, at *5 (Del. Ch. Aug. 19, 1983); *W.L. Gore & Assocs., Inc. v. Wu*, 2006 WL 2692584, at *13-14 (Del. Ch. Sept. 15, 2006).

## G. Tidel is Entitled to Relief

Entitlement to declaratory relief under Delaware law requires: (1) a controversy involving the rights or other legal relations of the party seeking relief; (2) a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; and (4) the issue involved in the controversy must be ripe for judicial determination.[200] Texas law is in accord.[201] Neither party disputes the existence of these elements. I also conclude independently that this controversy involves the rights of the parties seeking relief, both parties have an interest in contesting each others' claims, the controversy is between parties whose interests are real and adverse, and the issues are ripe for judicial determination.

Tidel proved entitlement to a declaratory judgment that: (1) the license granted to Tidel under the Software License Agreement as it relates to individual licensed products or systems licensed during its Term is perpetual; (2) the "Term" during which Tidel has the right to use the license granted by the Software License Agreement is not limited or terminated by the termination of the Manufacturing Agreement; and (3) the "Term" of

---

[200] *Marshall v. Hill*, 93 A.2d 524, 525 (Del. 1952).

[201] *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995) ("A declaratory judgment is appropriate only if a justiciable controversy exists as to the rights and status of the parties and the controversy will be resolved by the declaration sought . . . . 'To constitute a justiciable controversy, there must exist a real and substantial controversy involving genuine conflict of tangible interests and not merely a theoretical dispute.'" (internal citations omitted)).

the Software License Agreement extends at a minimum for a period of twenty years from the date the agreement was executed, March 29, 2013. Tidel also is entitled to a permanent injunction enjoining Revolution from representing in the marketplace or elsewhere that Tidel or any of its affiliates do not have a valid license to the Licensed Software.

## H. Attorneys' Fees

Texas law mandates the award of attorneys' fees for breach of contract—even if the contract is silent as to an award of fees.[202] To recover for attorneys' fees under Section 38.001, "a party must (1) prevail on a cause of action for which attorneys' fees are recoverable, and (2) recover damages."[203] A trial court "does not have the discretion to deny fees altogether if they are proper under section 38.001."[204] The claimant must show (1) it pled for attorneys' fees; (2) it has a claim against the defendant for which attorneys' fees are recoverable under the statute; (3) it was represented by an attorney; (4) the opposing party is an individual or corporation; (5) the claimant presented its claim to the opposing party; (6) the opposing party did not tender payment within thirty days

---

[202] TEX. CIV. PRAC. & REM. CODE ANN. §§ 38.001-.006 (West 2015); *see also Ventling v. Johnson*, 2015 WL 2148056, at *8 (Tex. May 8, 2015); *1/2 Price Checks Cashed v. United Auto Ins. Co.*, 344 S.W.3d 278 (Tex. 2011).

[203] *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997).

[204] *Graybar Elec. Co. v. LEM & Assocs.*, 252 S.W.3d 536 (Tex. App. 2008); *see also Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 201 (Tex. 2004).

following presentment; (7) the claimant prevailed on the claim; and (8) the claimant incurred reasonable attorneys' fees.[205]

The Texas Uniform Declaratory Judgments Act (the "Texas UDJA") also allows a discretionary award of attorneys' fees.[206] As permitted under the Texas UDJA,[207] both parties seek this Court's declaration of their respective rights, status, legal relations, obligations, and interests in and under the Software License Agreement as well as the Court's construction of the Software License Agreement. To the extent the Court awards a party declaratory relief concerning the Software License Agreement, that party is entitled to an award of costs and reasonable and necessary attorneys' fees as are equitable and just.[208]

Revolution seeks an award of reasonable attorneys' fees for prevailing on its claims for damages against Tidel for breach of the Manufacturing, Services, and Cross License Agreements. Further, Revolution represents that it can make the necessary showing required by Section 38.001(8).

Tidel challenges Revolution's entitlement to attorneys' fees on two bases. First, Tidel argues that, under Texas law, limited partnerships are not subject to Section

---

[205] TEX. CIV. PRAC. & REM. CODE ANN. §§ 38.001(8), 38.002 (West 2015); *1/2 Price Checks Cashed*, 344 S.W.3d at 383; *Great Am. Ins. v. N. Austin MUD*, 908 S.W.2d 415, 427 n.10 (Tex. 1995).

[206] TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (West 2015); *Barshop v. Medina Cty. Underground Water Conserv. Dist.*, 925 S.W.2d 618, 637 (Tex. 1996).

[207] TEX. CIV. PRAC. & REM. CODE ANN. §§ 37.001-.011 (West 2015).

[208] TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (West 2015).

70

38.001.[209]    In support, Tidel asserts that the two corporate defendants in this case, Sentinel Technologies, Inc. and Tidel, Inc., are holding companies against which no claims were pursued and no evidence was introduced at trial supporting the notion that either had any involvement in the transactions, events, or occurrences on which Revolution's claims are based. Thus, according to Tidel, because the only entity alleged to have committed any wrongdoing, Tidel Engineering, L.P., is a limited partnership not subject to Section 38.001, Revolution is not entitled to an award of its attorneys' fees and expenses. Second, even if I award Revolution its fees, Tidel avers that they must be reasonable in relation to the benefit achieved.

Revolution prevailed on its misuse of confidential information claims and I awarded it money damages, but only of a minimal amount. Assuming Revolution can make the required showings under Section 38.001(8), I conclude Revolution is entitled to an award of its reasonable attorneys' fees for prevailing on those claims. Tidel's argument that Revolution is not entitled to recover its attorneys' fees because Section 38.001 does not apply to limited partnerships is clever, but I reject it under the circumstances here. On February 14, 2014, Tidel Engineering, L.P., acting through Landry as its President and CEO, gave Revolution notice of Sentinel, Inc.'s termination

---

[209]    *See Fleming & Assocs., L.L.P. v. Barton*, 425 S.W.3d 560, 576 (Tex. App. 2014); *see also Ganz v. Lyons P'ship, L.P.*, 173 F.R.D. 173, 176 (N.D. Tex. 1997) (interpreting Texas Civil Practice Remedies Code to preclude recovery of attorneys' fees from limited partnerships).

of the Manufacturing Agreement.[210]  Furthermore, on September 5, 2014, Landry, in these same capacities, executed a release of rights under the Manufacturing Agreement, an agreement to which Sentinel, Inc. was a party.  Tidel, Inc. also was a party to the Manufacturing Agreement.  I conclude, therefore, that both Sentinel, Inc. and Tidel, Inc., as Defendants and as entities that were involved with the operative documents on Revolution's claim for contract damages are liable under Section 38.001 to Revolution for its reasonable attorneys' fees incurred in connection with the breach of contract claims referenced above.

As to Tidel's argument that the fee award must be reasonable in amount in relation to the benefit achieved, I have determined that a cap is appropriate based on the minimal damages awarded.  Specifically, Revolution is entitled to recover its attorneys fees and expenses on this claim upon submission of appropriate documentation, but the total amount may not exceed $25,000.

Both parties seek attorneys' fees arising from their claims for declaratory relief pursuant to Section 37.009.  As previously noted, Tidel prevailed on its claims for declaratory relief in every respect.  The Software License Agreement's plain language states that the licenses granted thereunder are perpetual; I held that the "Term" during which the Software License Agreement permitted Tidel to use that license is not limited or terminated by the termination of the Manufacturing Agreement; and I determined that the "Term" extends at least twenty years from the date the Agreement was executed—

---

[210]  DX 133 ¶ 9.

72

and probably longer. By contrast, I did not grant Revolution any declaratory relief whatsoever with respect to any of its claims arising from contracts governed by Texas law. Therefore, I award Tidel its reasonable attorneys' fees incurred in achieving the declaratory judgment it sought.

## III. CONCLUSION

For the foregoing reasons, Plaintiff, Revolution, is entitled to a permanent injunction based on Defendants' breaches of the Securities Purchase Agreement (Count I), a permanent injunction and limited money damages for Defendants' breach of the confidentiality and non-use provisions in the Manufacturing, Services, and Cross License Agreements (Count III), and no more than $25,000 of its reasonable attorneys' fees in prevailing on its damages claim under Count III. I further hold that Defendants are entitled to a judgment declaring their rights with respect to the Software License Agreement (Count I), a permanent injunction in connection with the same (Count II), and their reasonable attorneys' fees arising therefrom. In all other respects, the requests for relief from both Revolution and Defendants are denied. An implementing order accompanies this Memorandum Opinion.